## Case No. 8,264.

### The LEOPARD.

[2 Ware (Dav. 193), 197.] [1]

District Court, D. Maine. Sept. Term, 1842.

COLLISION — ENGAGED IN ILLEGAL EMPLOYMENT— HAVING FAIR WIND— STEAM CONSIDERED FAIR WIND.

1. Whether a vessel when engaged in an illegal employment can maintain an action for an injury received from another vessel by collision—Quaere?

2. When there is danger of collision between two vessels, the one that is sailing before the wind, or with a fair wind, must give way for one that is close hauled on the wind.

[Cited in Dickenson v. The Gore, Case No. 3,-893.]

3. A vessel moved by steam is considered as always sailing with a fair wind, and must, in all cases, give way for a vessel moved by the wind.

This was a case of collision. The libellants were the owners of a small steamboat plying on the Kennebec river, between the towns of Bath and Woolwich, as a ferry boat. On the 28th of April, while she was passing on her usual track from Woolwich to Bath, she was run afoul by the schooner Leopard, and considerably injured, and this libel was filed to recover the damage. The facts, as they appeared in evidence, were that the schooner was coming up the river, with a fair wind from the south-west which

---

[1] [Reported by Edward H. Daveis, Esq.]

carried her at the rate of six or seven miles an hour, but having the tide in her favor she was actually going at the rate of eight or nine miles. At the time when the accident took place the mate was at the helm, and the master on deck standing between the bulkhead and the mast, in such a position that he could see whatever was before the vessel and on her larboard, towards Bath, and could also see three or four points over her starboard bow, but her sail being spread hid from his view anything that might be approaching from the Woolwich side, nearly opposite to her, and anything in that direction was also by the sail hid from the view of the mate. The boat was approaching from the Woolwich side, with the schooner full in sight. As the two vessels came near to each other, Capt. Delano, who was a passenger on board the boat, seeing that they must come in collision if both held on their way, called out to the helmsman of the boat to put his helm up, and at the same time hailed the man at the helm of the schooner to put his helm down. The helm of the boat was put up accordingly, but the helmsman in the schooner, not hearing the call, she kept on her way, and the vessels immediately came in collision, the bows of the schooner striking against the side of the boat, and doing the damage complained of.

Sewall & Howard, for libellants.
N. L. Sawyer, for respondents.

WARE, District Judge. A preliminary question has been raised in this case as to the right of the libellants to maintain this suit, on the ground that the boat, at the time when the collision took place, was engaged in an illegal employment. It is provided by the Revised Statutes of Maine (chapter 27, § 1) that no person shall keep a ferry and receive pay from passengers without first obtaining a license therefor from the county commissioners, which the commissioners are authorized to grant from time to time, and to revoke when necessary; and the 9th section imposes a penalty on any person, who shall keep a ferry contrary to the provisions of the first section, of four dollars for each and every day it shall be so kept. As the libellants have shown no license for keeping a ferry, the argument is, that, the boat being engaged in an illegal employment, the owners can maintain no action for a tort against her by a vessel which was in the lawful use of the waters.

The libellants, in answer to this objection, claim the right to keep a ferry at this place, under the act of March 7, 1834, incorporating the Sagadahoc Ferry Company [Laws Me. 1834, p. 727]. By that act, John Parshley and others were created a body politic and corporate, under the name of the Sagadahoc Ferry Company, and authorized to establish and maintain a ferry across the Kennebec river, between Bath and Woolwich, at the place where this ferry is established, at any time within two years from the October after the passage of the act. In 1836, an act was passed extending the time for establishing the ferry to 1837 [Laws Me. 1836, p. 167], and under this act the ferry was put in operation. The company having become embarrassed, a suit was commenced against them by a creditor, upon which, in December, 1838, judgment was obtained, and the franchise was seized on the execution and sold on the 7th of March, 1839, to Wm. M. Rogers, for the term of one hundred years, to satisfy the judgment; and Rogers, by his deed of January 26, 1841, conveyed the same to the libellants, who thus became the owners of the franchise, for the term of time mentioned. It is not denied that the corporation, having by a special act of the legislature been created for this express purpose, might well establish and maintain a ferry without a license from the county commissioners, the act itself constituting a license until the franchise should be forfeited, surrendered, or lost, in some mode known to the law. The question is whether this authority passed by the sale on the execution to the purchaser of the franchise, and might by him be assigned to the libellant. In the case of The Maverick [Case No. 9,316], the question arose whether a license to keep a ferry was assignable under the laws of Massachusetts. The court held that it was not. The person who keeps the ferry must have the license. It is a personal trust reposed in him, upon the confidence entertained in his qualifications and fitness for the trust. The whole community have an interest in the character of persons who keep public ferries, which all travellers are obliged to use, and that none should be allowed to keep them but men of sober habits, and such as will be careful and attentive to the safety of those who are obliged to use them. The law, therefore, for the common benefit of all, requires that no one shall keep such a ferry until he has been approved and has obtained a license for that purpose from the prudential court of the county within which the ferry is. The law of Maine appears to be a transcript of that of Massachusetts, having been reënacted in the revision of the laws in 1821, and again incorporated into the Revised Statutes.

The only distinction in this point, between the case of The Maverick [supra], and the present case, is, that in the former the ferry was kept under a license from the court of sessions, and in this it is kept under a special act of the legislature, granting the franchise, and with it the authority to maintain a ferry, to the corporation. But, looking to the general policy of the law with respect to ferries as well as to the special provision of this act, the franchise granted must be considered as clothed with a trust, or at least subject to certain duties to be performed on their part. By the 4th section of the act the

corporation are required to keep good boats and in good repair, suitable and convenient for the accommodation of passengers, and to cause ready and due attendance to be given at all times; and for the neglect of any of these duties, they are subjected to penalties provided by the act. The corporation are bound themselves to keep up the ferry and manage it by their own servants. It would hardly be contended that the corporation, by their own voluntary act, could have transferred with the franchise a right to keep up this ferry without any supervision or control on the part of the county commissioners. Before the purchaser could have kept the ferry, he would be obliged to obtain the approbation and license of the prudential tribunal of the county, which the law has clothed with the authority of supervising and controlling the management of public ferries, and whose duty it is to take care that they are kept by suitable and proper persons. If this would be the case in a voluntary sale, it seems to me that the same reasons apply with equal force to a forced sale under the legal process. Otherwise the policy of the law may be defeated, and a ferry may fall into the hands of a person entirely unfit to be intrusted with its management. It appears to me, therefore, that the purchaser, before he can legally keep the ferry, must obtain a license from the county commissioners. If this be a correct view of the law, then the case of The Maverick is precisely in point, and this objection is fatal to the suit.

But, independent of this consideration, I am not satisfied that upon the general principles of the law of the sea, this suit can be maintained upon the evidence. The rules of the maritime law on the subject of collision are founded in common sense, and have for their object the general security and convenience of navigation. The general principle is this: when two vessels are under sail in such directions that, if both hold on their course, there may be danger of their coming in collision, the vessel that has it most in her power to vary her course and keep out of the way, is bound to do so. If she does not, and a collision ensues, she is liable for the damage. Thus, a vessel that is sailing before the wind, or with a fair wind, is bound to give place to another that is close hauled to the wind, because she has more control over her own motions and can more easily change her course. But a steamboat, that is not moved by the wind, and has her motive power within herself and entirely subject to her control, which can at pleasure be moved backward or forward, and can stop her motion altogether, has her movements more under her control than any vessel that is moved by the wind. It is always in her power to avoid a collision, if she is managed with ordinary skill and prudence, when it may be entirely out of the power of a vessel that is moved by

the wind and currents and must go where they carry her. For this reason, when steamboats came into use in the business of navigation, it was decided by the maritime courts, not by making a new rule of law, but by the application of an old and existing rule to a new species of vessel, that a steamboat is to be treated always as a vessel sailing with a fair wind, and is in all cases bound to give way to a vessel that is moved by sails. The Shannon, 2 Hagg. Adm. 173; The Portland [Case No. 8,583], quoted 3 Kent, Comm. (4th Ed.) 231. On this ground it was decided in a recent case by the district court of the United States for the Southern district of New York, that the rule of the maritime law relative to vessels with sails, viz.: that the vessel having the wind must bear away for one that is sailing on the wind, does not apply between steamboats and vessels with sails, but that a vessel moved by steam must in all cases give way to a vessel moved by sails. In that case a vessel having a fair wind, in conformity with the old rule, bore away for the boat, and by that means, through the inadvertence of the master of the boat, a collision took place, and the vessel was damaged. The court ruled that the vessel was in fault for not holding on her course, and consequently could not recover against the boat.

The decision in that case applies precisely to the case at bar. The schooner held on her course; and it was entirely in the power of the boat to have stopped her motion or changed her course so as to have avoided the vessel. And on the principle that has been repeatedly recognized by the maritime courts, both of this country and of England, the collision must be considered as resulting from the fault of the boat, and consequently no action can be maintained by the owners for the damage. Libel dismissed.