## THE DIANA.

### (District Court, E. D. New York. August 11, 1910.)

COLLISION (§ 45*)—STEAM AND SAILING VESSELS—NEGLIGENT NAVIGATION OF STEAMER.

A collision at sea at night between a steamer and a bark meeting on slightly converging courses *held* due solely to the fault of the steamer in changing her course when she was apparently upon and crossing the course of the bark, whose lights were both seen, under the erroneous assumption that the bark was also changing her course; it having been the duty of the steamer to stop and reverse if in doubt as to the course of the bark, whereas she continued at full speed.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 45.*]

In Admiralty. Suit by William Hansen, as owner of the steamship Diana, against Daniel Emery and others, owners of the bark Boylston, and cross-libel by the owners of the Boylston against the Diana. Decree against the Diana.

Wheeler, Cortis & Haight (Charles S. Haight and Clarence Bishop Smith, of counsel), for the Diana.

Wing, Putnam & Burlingham (James Forrester and Robinson Leech, of counsel), for the Boylston.

CHATFIELD, District Judge. On the evening of November 19, 1909, the steamer Diana was proceeding in the Atlantic Ocean off Barnegat, upon a course shown exactly by her compass readings as S. S. W. ½ W. At about 11 o'clock p. m., when the weather was perfectly clear and the stars shining, the lookout upon the bow of the vessel discerned what he calls the loom of the sails of a bark, the Boylston, "right ahead." He called this to the attention of the officer upon the bridge, who observed the bark through his glasses. The distance of the bark from the steamer is estimated by these witnesses at different amounts from one-half a mile to two miles; but, under the circumstances and in the darkness, it would seem that the smaller estimate was more nearly the correct one, at least at a time when the situation of the boats had any effect upon their actions.

The officer in charge testifies that he observed the sails, and shortly after made out both lights of this vessel; the red light being less distinct than the green. He had the steamer's helm put to port, the

---

wheel being thrown about half over, while he observed the bark through his glasses. Under this wheel the ship continued her course at a speed of some 9 knots, covering about 900 feet per minute, and turning to the starboard or toward the west. The bark was sailing directly before the wind and was making about 5 knots an hour upon a compass course shown by the testimony to be exactly N. E. As the officer of the steamer observed the lights of the bark and looked at them through his glasses, the red light disappeared, from which he concluded that the bark had changed her course and was turning to port.

The boats then being comparatively near, the officer of the steamer, assuming that there was not time nor space to change back to starboard, gave the order hard aport, in an endeavor to keep away from what he supposed was a turn in the same direction on the part of the bark. The steamer, under this helm, swung around some 8 points from her original course, and at the time of the collision was heading approximately N. W. The captain of the bark testified that the bow of the steamer struck the bark on the anchor-stock, which was hanging over the port side in the usual position, and that the stem of the steamer then scraped along the bowsprit of the bark and injured the rigging. But the testimony of the other witnesses and the injuries to the vessels would indicate that the bark and the steamer swung together in such position that the bowsprit of the bark came in contact with the funnel rigging of the steamer; that, as the force of the blow swung the bark to port, her anchor-stock came in contact with the side of the steamer, a little aft of amidships, and there indented several plates, the vessels then scraping along until they cleared one another, when the steamer continued on a circle toward the north and finally came back to the bark. The captain of the bark then hailed the steamer and demanded that she stand by, and understood the captain of the steamer to give him the name "Arondale." After some discussion both vessels proceeded, the steamer standing by till daylight, when the captain observed that the name of the steamer was "Diana," and port was made without further accident.

From the standpoint of the bark the story of the collision is that the steamer was seen for a distance of some three miles, approaching on a course which would cross the bow of the bark; that the steamer continuously showed her green light until she reached a position two or three points upon the starboard bow, when the steamer suddenly changed her course to starboard and headed for the bark. In this dangerous position, the captain of the bark and the mate testify that she was swung sharply to port in an endeavor to avoid the blow, and that it was impossible to keep out of the way of the steamer; the captain on the stand testifying that the bark had hardly begun to change her course when the blow came.

The captain of the bark is unable to explain how the steamer could have made such an abrupt change of course in such a short distance, and he testified that the only blow struck by the steamer was with her stem against the anchor-stock of his vessel. But it is evident that a blow such as he describes would have caused more injury, and that the contact of the vessels was as has been described, and on more

nearly parallel courses than it seemed to him in the excitement of the moment. The officer of the steamer who gave the orders fixes the position of the bark at the time of giving the order hard aport as one point on the port bow of the steamer. It is evident that if, after sighting the bark dead ahead and upwards of half a mile away, the steamer continued upon a course even 1½ points across the path of the bark, and if this officer, thinking to pass the bark to port, had his helm ported, the speed of the vessel and the curve described under the port helm would still carry the steamer to a point where the bark would be to starboard but upon the port bow as the steamer swung around. Such a movement would shut in the red light of the bark, and it seems to have given rise to the erroneous supposition on the part of this officer that the bark was at the same time changing its course to port.

It is difficult to see why the officer, if he considered that the bark was close at hand and that its lights had not been discovered in sufficient time to avoid danger, and if he felt that there was not time to ascertain exactly what the movements of the bark might be, did not stop the progress of the steamer rather than to proceed on the new course at full speed. If the steamer was in this position, and her officer mistook the movements of the bark because of the steamer's own change of position, then the steamer must be held responsible. If the boats were in such position that there was not time to correctly ascertain what course the bark was holding, and to estimate whether the steamer could go to port or should proceed across the bark's bows, then the steamer should have been stopped and reversed so as to lessen the danger of the position. If the steamer intentionally proceeded to make a turn such as is described by the officers of the bark, she should not only be held responsible, but such maneuver on her part would be a deliberate attempt to run down the bark and is inconceivable.

The officers of the steamer testify that, when the loom of the sails of the bark was first seen, the bark was dead ahead. If, at the same time, the officers of the steamer could see both lights, the vessels must have been on substantially the same course, and a turn to starboard, in order to pass port to port, was the proper maneuver. But the compass courses of the vessels show that they could not have been upon the same course. The Diana, upon the compass course indicated, at a distance of half a mile, would have been in a position where she could have seen the Boylston dead ahead, and in the space of a few seconds crossed the course of the Boylston so that both lights would then be visible. If the steamer's helm were then ported, the speed of the steamer would be sufficient to shut out the Boylston's red light; but no collision would have been possible, if the Diana had either held her course or turned to port instead of to starboard. The speed of the steamer was greater than that of the bark. She covered substantially twice as much ground as the bark before the collision happened, and even then made a turn of eight points to starboard and nearly cleared the Boylston, whose bowsprit first came in contact with the funnel stays of the steamer.

On the other hand, if the Boylston was not exactly dead ahead, but if the compass courses were as shown by the testimony, and if the

Diana saw both lights of the Boylston at the time of ordering a change of helm, the situation must have been such that the Diana immediately passed across the bows of the Boylston to starboard, and no collision could have resulted if the Diana had not turned back under her port helm.

From the standpoint of the positions of the boats, as understood by the first officer of the Diana, the movements of the Boylston and the testimony of her witnesses are so contradictory and extraordinary as to justify a reference to those cases in which the testimony of a deliberate change of course, in order to cross the bows of the injured vessel, has been held incredible. From the standpoint of the Boylston, the testimony of the witnesses for the Diana is incapable of being reconciled with what the Boylston's crew claim they observed, and the whole situation, as well as the testimony of all the witnesses, must be weighed together in determining the precise facts.

The Boylston has charged the Diana with fault and filed a libel for the damage she sustained. The Diana has alleged that the Boylston was wholly at fault and has also libeled that vessel for the damages of the Diana. The burden of proof, therefore, is upon each party to prove the charges it makes, and the cross-allegations put the court under the necessity of determining the facts from the stories of both parties, rather than to see if either one has sustained the burden of proof. Under these circumstances, it must be held that the officer of the Diana, who mistook the movements of the Boylston, was responsible for the collision; and, as the vessels were not in extremis, his mistake must be held negligence, and the Diana held responsible for the damages to the bark.

But before resting upon the question of negligent seamanship, one or two other points must be considered. The steamer alleges that the bark was at fault in having poor lights and in having them placed on davits at the extreme stern, instead of at the point of greatest beam of the hull of the vessel.

The statute requires the lights to be placed at or near the greatest width of the ship. But upon a bark the sails would not interfere with the lights at the stern. These lights are there in less danger, more easily observable from the deck, and the davits are in fact the widest part of the bark. It would not seem, therefore, that the placing of the lights at the stern is of itself a ground for criticism. The lamps themselves were constructed according to the custom of ordinary usage, met the requirements of the statute, and, while so situated that from a position dead ahead the cordage and rigging of the vessel obstructed in daylight a view of the lamp, nevertheless it would seem that, when lighted, their beams would be thrown straight ahead in such a manner as to comply with the requirements in that regard.

It only remains to consider the fact that the lights of the Boylston were not observed at anything like the distance of 5 miles, which the witnesses testify such lights would usually be visible. It may be that the lamps were not kept in condition, or that they did not burn as brightly as possible; but nothing is shown except that they were not seen by the lookout or the officers of the steamer. Later that night they were observed at a distance of 1½ miles, but were said to be dim.

If the accident were attributable solely to difficulty in observing these lights, responsibility for their not having been seen would have to be determined; but the court cannot see how the steamer can be free from blame under the findings which have been made, when the collision was caused by negligence of its officers after they did discover the lights, there being no reason or necessity for the collision if the vessels had held their course, or if the steamer had not assumed that the bark was turning to port when her red light was shut out of view.

The libelant Emery may have a decree, and the libel of the owners of the Diana will be dismissed.