GRAVES v. LAKE MICHIGAN CAR FERRY TRANSP. CO.

(Circuit Court of Appeals, Seventh Circuit. October 4, 1910.)

No. 1,670.

1. COLLISION (§ 73*)—MOVING AND ANCHORED VESSELS—PRESUMPTION OF FAULT.

In admiralty the rule is settled that a moving vessel must keep away from a vessel properly anchored and lighted, and collision in such cases raises a presumption of fault against the vessel in motion, placing upon her the burden of exonerating herself from blame for the collision; but the general law of the sea becomes applicable to such collisions when the anchored vessel is improperly moored in the fairway or otherwise appears at fault, and evidence of negligence on the part of the anchored vessel, either as sole or contributory cause of the collision, establishes a case within the general rules of admiralty as to the liability for damages.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 103; Dec. Dig. § 73.*]

2. COLLISION (§ 72*)—MOVING AND ANCHORED VESSELS—MUTUAL FAULTS.

A tug with a tow passing down Sturgeon Bay on a stormy night *held* in fault for a collision between her tow and a schooner barge moored to her consort which was anchored near the entrance to Green Bay for continuing at full speed of about eight miles an hour after she saw the lights of the anchored barges and for keeping an insufficient lookout; it appearing that she mistook the anchor lights of the barges for those of a moving steamer until close by. The barge also *held* chargeable with contributory fault for anchoring in the fairway on a much frequented course when there was better anchorage a mile or so farther, and on a line which allowed her to swing through a considerable distance with the variable wind, and also because the stern light of the leading barge was not set lower than the forward light, as required by rule 9 of the navigation rules for the Great Lakes (Act Feb. 8, 1895, c. 64, 28 Stat. 645 [U. S. Comp. St. 1901, p. 2888]).

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 102; Dec. Dig. § 72.*

With or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

Kohlsaat, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in admiralty by Luther P. Graves, as owner of the schooner barge Annabell Wilson, against the steam tug S. M. Fisher and Car Ferry No. 1, the Lake Michigan Car Ferry Transportation Company,

claimant, and cross-libel against The Wilson.   Decree against The Wilson alone, and libelant appeals.   Reversed.

This appeal is from a decree of the District Court in admiralty, condemning the appellant's schooner barge, under libel and cross-libel filed for recovery of damages arising out of a collision, at night, between Car Ferry No. 1, in tow of the steam tug S. M. Fisher, and the schooner barge Annabell Wilson, while the Wilson was lying at anchor in the navigable waters of Sturgeon Bay.   The appellant Graves filed the libel, as owner of the Wilson, against the steam tug and her tow, charging fault in their navigation as the cause of collision, and the appellee answered, as claimant of both tug and tow, averring (in effect) their proper navigation, and that the Wilson is alone chargeable with fault for the collision, due to her place and manner of anchorage and insufficient lights, within the channel and course of vessels bound for ports on Green Bay.   With like averments the appellee filed its cross-libel—the libel standing as answer thereto—and the issues were submitted and the testimony heard (in open court) before the district judge. The issues were found in favor of the appellee and cross-libelant (without other opinion stated of record), and the decree appealed from awards damages ($77.21) and costs against the appellant.

The material issues and facts in controversy are stated in the ensuing opinion.

Charles E. Kremer, for appellant.
W. T. Abbott and Robert J. Folonie, for appellee.
Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

SEAMAN, Circuit Judge (after stating the facts as above).   The general locality of the collision in suit was at the entrance between Sturgeon Bay and Green Bay, having about two miles of water, in most part navigable, between the shores; and the appellant's schooner barge Wilson was at anchor off Sherwood Point, on the southerly shore of such entrance, within or near the usual (and charted) course of vessels bound to or from the ports of Green Bay or Peshtigo. Sturgeon Bay is a fine expanse of water, both for navigation and for anchorage grounds, extending from the Sturgeon Bay Canal, westerly and northwesterly to Green Bay, with an expansion northeasterly forming good shelter and anchorage, and another expansion southwesterly, called Sawyer Bay, also used for anchorage.   The Wilson had discharged cargo at Sawyer, and on the day before the collision had been towed out of Sawyer Bay by a fishing tug, for anchorage to await the arrival of her towing steamer, Mohican.   On rounding Sawyer's Point, in Sturgeon Bay, her consort schooner barge Mingo, owned by the appellant, was found at anchor, and the Wilson passed a line to the Mingo, making fast astern, instead of putting out her anchor.   Their distance from the shore and actual location in reference to Sherwood Point are in dispute under the testimony.   As stated on behalf of appellee, the bearings of the Wilson were taken immediately after the collision, as one mile from Sherwood Point light S. S. E. by E. ½ E. and "a quarter of a mile right due east" of Sawyer's Point; while the witnesses for the appellant place their anchorage about half a mile northeast of the light, with about half a mile of navigable water between the vessels and the shore.   It is undisputed, however, that the wind was blowing fresh and puffy from the northwest, lining the vessels, accordingly, about parallel with the shore line; that the Mingo

had out 30 fathoms of anchor chain and was 200 feet in length; that the line from the Wilson measured 150 feet, and her length was 174 feet; that the "Wilson swung slightly" both ways; and that both white (anchor) lights on the Wilson were placed "about 20 feet above the deck." Witnesses for the appellant testify that vessels passed them on both sides while they were thus anchored.

The night of the collision was dark and squally. It had been raining, but the testimony is conflicting whether the rain continued up to the time the respective lights were discovered. The steamer Fisher, towing Car Ferry No. 1, came up from the canal; her course being westerly and northwesterly and bound for Peshtigo. When the lights of the anchored vessels were sighted, they were taken to be "a steamboat going ahead" of them. And the master of the Fisher testifies that he only made out the colored lights when "his electric light showed on this barge" and that "she was right on our starboard bow"; that he put his "helm hard astarboard" and swung "toward the beach, Sherwood Point"; that the Wilson was swinging shoreward, and caught the towline between the Fisher and Car Ferry, so that the Car Ferry struck the Wilson astern, inflicting and receiving the injuries complained of.

The decree appealed from condemns the Wilson as at fault and alone chargeable for the collision damages. Error is assigned, upon both rulings—that the Wilson was at fault, and that the Fisher was not negligent and not answerable for the damages. So, the first question to be solved is whether fault on the part of the Wilson was rightly found by the district judge under the evidence.

In admiralty the rule is settled: That the moving vessel must keep away from a vessel properly anchored and lighted, and collision in such cases raises a presumption of fault against the vessel in motion, placing upon her the burden of exonerating herself from blame for the collision. The Virginia Ehrman and The Agnese, 97 U. S. 309, 315, 24 L. Ed. 890; The Oregon, 158 U. S. 186, 192, 15 Sup. Ct. 804, 39 L. Ed. 943, and cases cited. The authorities are numerous, however, that the general law of the sea becomes applicable to such collisions, when the anchored vessel is improperly moored in the fairway, or otherwise appears at fault (Ross v. Merch. & Miners' Transp. Co., 104 Fed. 302, 303, 43 C. C. A. 538; City of Birmingham, 138 Fed. 555, 559, 71 C. C. A. 115; The Scioto, Fed. Cas. No. 12,508, 2 Ware, 360, and notes); and we believe it to be unquestionable that evidence of negligence on the part of the anchored vessel, either as sole or contributory cause of the collision, establishes a case within the general rules of admiralty as to liability for the damages.

While the evidence is conclusive that the Wilson was moored within the usual course of navigation to and from the upper Green Bay ports —whether in one or the other place, in dispute under the testimony— and that no emergency of weather or other circumstances made such location needful, it is equally well established that there was abundant navigable water for clearance on her port hand. Unless the circumstances in evidence, therefore, were liable to mislead the approaching steamer as to the fact or method of anchorage, it may be conceded

that the Wilson should not be chargeable with fault. Nevertheless, it is obvious that the master and lookout of the steamer Fisher were deceived by the location or the lights (or both) and misunderstood both fact and method of anchorage. The testimony is conflicting whether anchorage off Sherwood Point was or was not customary, or deemed safe or unsafe, within or without the usual course of navigation; but the evidence is convincing, if not undisputed, that the other side of Sturgeon Bay affords both abundant and better anchorage ground for vessels; and the master of the Mingo, who fixed the anchorage place, had not visited Sturgeon Bay for 10 years prior to his present trip. We believe both masters were mindful of a convenient place to be taken in tow, and not of better anchorage ground to leave clearance for navigation, and that the testimony is sufficient to support the finding that the Wilson was at fault, in the following particulars: Their anchorage in the fairway, for days and nights, if not negligence per se, was an obstruction without reasonable cause—and possible menace in darkness or thick weather—to free passage of vessels on a much frequented course. While the testimony is conflicting (as above mentioned) whether it was reasonable and customary for vessels to lie at anchor off Sherwood Point, it is far from satisfactory that it was either reasonable or usual to thus anchor in the course, or that navigators were chargeable with notice that such anchorage was to be expected. Instead of putting out an anchor, the Wilson made fast astern of the Mingo, with 150 feet of line, so that she was constantly swinging under the variable wind; and, if such method was usual (as stated by witnesses) in free anchorage ground, no sanction appears for it under the circumstances. We believe it was a material contributory cause of the collision. The anchor lights of the Mingo, as the master testifies, were placed alike 20 feet above the deck, and not in conformity with rule 9 of the act regulating lake navigation (Act Feb. 8, 1895, c. 64, 28 Stat. 615), which requires the stern light to be "not less than 15 feet lower than the forward light" (3 U. S. Comp. St. 1901, p. 2888); and this departure from the rule tended, as we believe, to confuse the lookout of the approaching steamer—a failure chargeable as well to the consort Wilson.

We are of opinion, however, that fault for the collision is attributable to the speed and navigation of the steam tug Fisher and her tow in approaching the injured vessel. Although the appellee's witnesses state her speed at various rates, from 7½ to 5 miles an hour, it is stated in the answer to the libel at 8 miles an hour, and no actual moderation of speed appears at any stage of the approach. This we believe to be unreasonable under the conceded circumstances. It is conceded that the lights on the anchored barges were observed from the Fisher when about a mile away, although they were taken for the lights of a moving steamer, outward bound. The night was dark, and rain obscured the lights, as testified on the part of the Fisher; and not only was her speed kept up, but the lookout was called by the wheelsman to take the wheel, immediately after reporting the lights ahead, and was not serving as lookout thereafter, leaving the master alone to observe the lights and course. Under the testimony, we are satisfied

that a vigilant lookout should have discovered the colored lights and position of the Wilson and Mingo when a quarter of a mile away, to say the least; and the master of the Fisher admits that he "would have had no trouble in keeping away from her" had he "seen these red lights" at that distance. He changed course only when 150 feet away, having then (as he testifies) first discovered the red lights and position of the Wilson on his starboard bow. He immediately ordered his helm "hard astarboard," without giving warning or signal to his tow, and thus cleared the Wilson, although she was then swinging in the same direction according to the testimony. The master of the Car Ferry was left to follow his tug, as best he could; but the swing of the Wilson caught the towline, and the stem of the Car Ferry struck her astern, causing the injuries in suit, both to the Wilson and the Car Ferry.

We believe negligence thus appears in the navigation of the Fisher, and that the decree is erroneous, in exonerating her from liability for such injuries and allowing full recovery against the appellant.

The decree of the District Court, therefore, is reversed, with direction to enter a decree for division of damages as found, and of costs as well, to be borne by the parties respectively, in conformity with the provisions of admiralty for like cases of mutual fault; and it is ordered that the appellant recover the costs of this appeal.

KOHLSAAT, Circuit Judge (dissenting). I am unable to agree with the majority of the court in holding that the Mingo and Wilson were guilty of negligence which contributed to the collision. While there is a conflict of testimony as to the location of the Mingo and Wilson, it is conceded that there was abundant sea room on both sides. It is shown that vessels passing through Sturgeon Bay to points on Green Bay usually take a general course which brings them somewhere in proximity to the place of anchorage of the libelant's barges, though the whole bay is good sailing water. It appears from the evidence that while at anchor the libelant's barges were passed by a number of vessels going up and down Sturgeon Bay—sometimes on the port side and sometimes on the starboard.

So far as the evidence goes, there is no defined course through Sturgeon Bay along which a vessel may proceed at night without keeping a strict lookout. It appears that the object of those in care of the barges, in making the Wilson fast to the Mingo, and in anchoring near the usual course of vessels through the bay was to be in readiness to be picked up by the Mohican. It further appears from the evidence of a number of witnesses for libelant that anchorage near the traveled course was not unusual. On the part of respondents, a number of witnesses testify that it was not a proper or usual thing for vessels to come to anchor in that course. Several of libelant's witnesses swear that they have on various occasions seen vessels so anchored. While, perhaps, it was not the safest place to anchor, yet the libelant was chargeable with only reasonable care, and it cannot be said that it was per se negligence on the part of the barges to anchor where and as they did, no matter in which of the places claimed they were anchored.

For respondent, it is asserted that, owing to the darkness and thickness of the night, it was impossible to see the barges themselves in time to avoid the collision, and that the lights, on which alone the Fisher had to rely, were not properly displayed.

The answer states that the Wilson had a white light, which only showed from her stern; that it had red lights, but whether they were in the forward and mizzen rigging respondent does not know, but calls for strict proof; that the red light could be and was seen about a quarter of a mile away; that the Mingo displayed two white lights, one forward and the other aft, which could be and were seen almost a mile away, except when the squall and rain were too strong.

Respondent claims that it was misled by the position and lights of the barges into believing that the lights were carried by a steamer going out of Sturgeon Bay into Green Bay. Neither the answer nor the cross-libel charge the absence of the lights required by statute in case of vessels at anchor, i. e., one white light at the forward part of the vessel at a height of not less than 20 feet nor more than 40 feet, and one at or near the stern not less than 15 feet below the forward light (article 11, tit. 48, p. 2867, Comp. St. 1901), as in any way responsible for the collision. The failure to see the lights is attributed rather to the thick squally weather. The testimony as to the relative altitude of the several lights of the Mingo is unsatisfactory and indefinite. It nowhere appears just what was their position. It does appear, as above stated, that the Wilson had her regulation lights set, i. e., two red lights, one in the forward rigging and one in her mizzen rigging, and one white towing light showing only from her stern, and that they were seen by the Fisher.

It is contended for respondent that no proper lookout was maintained upon the Wilson. The evidence shows to the contrary; though just how a lookout, however diligent, could have averted the accident, is not stated, except that it is claimed the Wilson might have shown a torch or flare-up, rung a bell, shouted, blown an alarm whistle, or taken some means of attracting the Fisher's attention. If she had her lights set as above stated, she had no reason to assume that the Fisher and tow would run into her, and consequently had no time in which to sound or give an extraordinary alarm, nor could she, under the circumstances, be blamed for not shortening her line.

There are discrepancies between the admissions of the answer and cross-libel and the evidence. For instance, the rate of speed maintained by the Fisher up to the time of the collision is admitted by the answer to have been about 8 miles an hour. Respondent's witnesses fix the speed at about 7½ to 5 miles an hour. The libelant is entitled to whatever advantage there may be, if any, in assuming the speed to have been 8 miles an hour. The case comes fairly within the rule laid down in Totten v. The Pluto, Fed. Cas. No. 14,106; Ward v. The Fashion, Fed. Cas. No. 17,154; The Santa Claus, Fed. Cas. No. 12,327; Palmer v. Merchants' & Miners' Transp. Co. (D. C.) 151 Fed. 695.

There seems to be no doubt the whole navigable water of the bay was open to the Fisher. She had sighted some of the barge lights more

than a mide off. She saw that she was gaining upon them and still kept on her stern chase at a speed of eight miles an hour. Even though she may not have been able to see the Wilson's red lights all the time, she did see them a quarter of a mile away. Even though there may have been some uncertainty as to the placing of them, she knew there was some craft just ahead which she was overhauling. Notwithstanding this, she kept up her eight-mile rate of speed. She was not justified in endeavoring to see how closely and how fast she could pass the lights on such a stormy and gusty night as respondent describes, and in such a sea and wind. According to respondent, it was difficult to see the lights at times. That surely was enough to make her wary. Why, when she had the whole bay to sail in, she should, on such a night, follow up directly in the wake of the lights she saw, can be accounted for only by attributing carelessness to those in charge of her. Furthermore, it appears from the evidence that at the time of the collision the Fisher's wheelsman had gone below, and that the lookout had taken his place at the wheel temporarily. The captain claims to have been on the lookout. Even though this be assumed to be true, the tug was shorthanded. With the lights in front of her and the storm about her, this was in itself evidence of lack of diligence, and the burden of proof was on the tug to show that this fact did not cause the accident. The Fisher's negligence was clearly the proximate cause of the collision.

Under the doctrine laid down by the Supreme Court in The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943, The Clara Clarita, 23 Wall, 1, 23 L. Ed. 146, and The Virginia Ehrman, 97 U. S. 317, 24 L. Ed. 890, the burden of proof was upon respondent to show either that the Fisher was without fault or that the collision was occasioned by the fault of the Wilson, or that it was the result of inevitable accident. This the respondent has failed to do.

Under the circumstances, respondent should be held to pay the full amount of the damages sustained by the libelant.