THE ANNA W.

(Circuit Court of Appeals, Second Circuit. December 9, 1912.)

Nos. 87, 88.

1. COLLISION (§ 95*)—TUG AND TOW WITH SCHOONER—NEGLIGENCE OF TUG—EXCESSIVE HAWSERS.

A schooner passing up the main ship channel into lower New York Bay at night before the wind against an ebb tide at a speed not more than 1½ knots came into collision with the tow of a meeting tug on a hawser 1,200 feet long, in violation of navigation regulations under Act May 28, 1908, limiting hawsers to 75 fathoms and as much shorter as the weather or sea will permit. The tug and schooner passed port to port not more than 50 feet apart, though there was plenty sea room to the west. The schooner held her course until just prior to collision with the tow. *Held*, that the tug was at fault in failing to keep further to the west of the channel in view of her duty as the burdened vessel to keep out of the way, and also by reason of the length of the hawser which by the set of the tide would cause the tow to sag to the eastward of the tug's course.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

2. COLLISION (§ 77*)—FAULT—FAILURE TO KEEP LOOKOUT.

Where a schooner came into collision with the tow of a passing tug, the schooner would be held at fault in failing to keep a lookout unless she could affirmatively show that if there had been a lookout, and he had done his duty in seeing and reporting other vessels, and the schooner had navigated in conformity with the information thus obtained, the collision would nevertheless have happened.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 140–149; Dec. Dig. § 77.*]

3. COLLISION (§ 44*)—NAVIGATION—SAILING VESSELS.

Where a sailing vessel, required by rule to keep her course, sees both lights of an approaching steam vessel which is in a position to pass either to starboard or port, the privileged vessel is bound to hold her course until it is certain which side the burdened vessel will elect to pass on, and then act accordingly.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 48–50; Dec. Dig. § 44.*]

4. COLLISION (§ 61*)—TUG AND TOW MEETING SCHOONER—NAVIGATION.

A tug and tow and schooner were approaching each other head on at night, at a point where it was entirely practicable for the tug and tow to pass either to starboard or port. Both lights of the tug were visible until she reached a point 300 to 400 feet from the schooner, when the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

green light was shut out. There was no blast of the tug's whistle or anything else to indicate her intentions. *Held* that, as soon as the tug's green light was shut out, the schooner's lookout would have been sufficiently advised that the tug intended to pass to port, so close that collision with the tow was inevitable unless the schooner took prompt action, and, not having done so, the schooner was at fault in failing to have a lookout which contributed to the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 78; Dec. Dig. § 61.*]

.5. COLLISION (§ 154*)—APPEAL.

Where, on appeal from a decree finding that a collision between a schooner and a tow was a result of the negligence of the tug, appellant undertook to show not only that the schooner was at fault, but also that the tug was free from fault, while appellee sustained only so much of the decision below as found that the tug was at fault, and did not defeat the contention that the schooner was also at fault, neither side would be awarded costs on appeal.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 308; Dec. Dig. § 154.*]

Appeals from the District Court of the United States for the Eastern District of New York; Thomas I. Chatfield, Judge.

Suits in admiralty by Jared Griffing, as owner of the schooner Daylight, and by the President and Directors of the Insurance Company of North America, against the steam tug Anna W. Decrees for libel (181 Fed. 604), and the claimant, the National Dredging Company of Wilmington, Delaware, appeals. Modified and affirmed.

This cause comes here upon appeals by the claimant from decrees of the District Court, Southern District of New York, holding the Anna W. solely in fault for a collision between her tow, the scow P. B., No. 1, and the schooner Daylight. The first suit was brought to recover for the total loss of the schooner and the personal effects of her master and mate. The second suit was to recover for the loss of a cargo of coal laden on the schooner.

The collision happened between 4 and 5 a. m. January 17, 1910, in the lower bay of New York near the middle of the main ship channel to the northward and eastward of the Quickstep Buoy. The tug, with her loaded tow on a hawser of about 600 fathoms was bound down the channel. The schooner was bound up with a following wind, some witnesses say she was winged, others that her sails were all to starboard, but that her forward sails were not drawing, the mainsail not guyed, but swinging back and forth. The wind was light, 9 knots at Sandy Hook, and the tide ebb, so her progress up the bay was about 1½ knots an hour. The speed of tug and tow was about 5½ knots with the tide. The tug and schooner passed each other port to port, but the port bow of the scow struck near the bluff of the schooner's port bow.

The opinion of the District Judge is found in (D. C.) 181 Fed. 604.

Carpenter & Park, of New York City, for appellant.

L. D. Armstrong, of New York City, for appellee Griffing.

Lawrence Kneeland, of New York City, for appellee President and Directors of Insurance Co. of North America.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). [1] It must be taken as a fact in the case that from the time they sighted each other the schooner held her course until she hardported as the tug reached her bow. Her witnesses say she did, the probabilities are

that a privileged vessel would do so, and there is not a scrap of evidence to the contrary.

The pilot of the tug brought her down on a course close to the schooner. He says he cleared her by 100 feet; other witnesses make the distance 25 feet. Whether we split the difference and call it 50 feet, which it probably was, since on this dark night he could see the ripple under the bow of the schooner going as slowly as she was, or whether we leave the distance at 100 feet, the event shows that he brought his tug so close that collision between the schooner and the tow was inevitable unless the schooner changed her course to the eastward. The pilot says his tow was straight behind him. · If he is right in his estimate of 100 feet clearance of the schooner, he must be wrong as to the tow following exactly. When confronted with this proposition, he can account for the collision only by suggesting that "the schooner *must* have luffed" (to westward). He does not pretend that he saw her luff, and his own witness, Vickery, whose eyes were on her, says she did not luff, but "swung off" (to eastward). Probably the tow was somewhat to the eastward of the tug—the set of the tide testified to by other witnesses than the schooner's would indicate that. We do not think she was much to the eastward, but if she were only 50 feet to eastward, a very slight sheer with a 1,200-foot hawser, and the tug passed as the schooner's witnesses say she did 25 feet from the latter, collision would follow unless the schooner got further to eastward.

Manifestly, as was the case in the Gladys, the tug, a burdened vessel, had brought about a situation where the privileged vessel could escape collision only by herself changing course, contrary to the rule. There is no sufficient excuse shown for the tug's producing such a situation. To the westward was the Du Bois; but her course was 125 feet off, and the Anna W. was going faster than the Du Bois. To the eastward of the center of the channel (where the schooner was navigating) was clear water, no vessels at all, and abundant room to pass the schooner to the eastward without intruding on Ambrose Channel where vessels like the tug herein had no right to be.

It seems to us that the Anna W. was clearly in fault for this.

Moreover, this collision happened in January, 1910. The board constituted by the Act of May 28, 1908, had promulgated in December of that year the following regulation covering the inland waters where the Anna W. was navigating:

"(2) Hawsers are limited in length to 75 fathoms from the stern of one vessel to the bow of the following vessel; and should in all cases be as much shorter as the weather or sea will permit."

With a hawser 200 fathoms in length the tug was violating this regulation, which the statute provides "shall have the force of law," and it is not shown that this violation did not contribute to bring about the collision.

We therefore concur with the District Court in the conclusion that the tug was in fault.

[2] As to the fault on the part of the schooner, she had no lookout and must be held in fault therefor, unless she can show affirmatively

that, if there had been a lookout, and he had done his duty in seeing and reporting other vessels, and the schooner had navigated in conformity with the information thus obtained, the collision would nevertheless have happened. The master of the schooner says they saw the tug's lights two miles off; the mate makes the distance one mile. Even if it were a little less than that, there would be ample time for all proper maneuvers. Although the tow's lights were good and properly placed, they probably were not as bright as the tug's and might not have been seen till a little later. But concede they were visible at the same time. The schooner would then be advised that the tow was either following directly behind the tug (as the tug's pilot says), or was following somewhat to eastward of the tug's course (as the evidence convinces us she really was).

What then should the schooner have done? The evidence shows conclusively that they were approaching substantially on opposite courses; the schooner N. by E., the tug S. by W. ½ W. The schooner's witnesses say that from the beginning they saw both lights. There is nothing in the proof to indicate that they did not. They also say that the red light seemed somewhat the dimmer, which they thought was because it was partly screened, an indication that the tug was probably bearing to the east. But even if we reject this statement of theirs, as to the red light we have a situation, which arises often and which we have many times considered.

[3] A sailing vessel, required by rule to keep her course, sees both lights of an approaching steam vessel which is in a position to pass her either to starboard or to port. We have repeatedly held that the privileged vessel should hold her course till it is certain which side a burdened vessel (which may lawfully pass on either side) will elect to pass on. If for instance the privileged vessel should too soon *assume* that the passing would be port to port and change her course to starboard, and the burdened vessel should at the same time elect to pass to starboard and change her helm accordingly and collision follow, the privileged vessel would be clearly in fault for disobeying the rule, because had she followed the rule, as the steamer had the right to believe she would, the later would have avoided her and no collision resulted. The privileged vessel must hold on till she is reasonably certain what the other is going to do. In The Gladys, 144 Fed. 653, 75 C. C. A. 455, cited on the brief, the tug and tow (two-thirds of a mile long) was heading N. E., the sailing vessel N. N. W. We pointed out that, by reason of the length of the tow, it might seem improbable that the tug could have gone under the stern of the tow, and impossible that the long tow could cross ahead without collision if the schooner kept on. In the opinion the crucial moment is indicated as the "moment when the tug crossed the schooner's course, because then it was impossible for the tug to go under the schooner's stern." The schooner in that case was held in fault, because (in the opinion of the majority) she did not take immediate action when the tug crossed her course, but kept her own course until about 500 feet of the hawser between the tug and first tow had also crossed. "If, the moment she saw the tug cross

her course, she had gone off to starboard, she would certainly have escaped."

[4] In the case at bar, the master of the schooner is surely wrong in fixing the distance between the two vessels at 600 feet when he saw the green light of the tug shut in. The tug was not changing her course, and on their relative courses and in their relative positions they would be closer together when the screen would begin to cut out the green light. The wheelman says it was 300 to 400 feet when the green light shut in. Until that point was reached and in the position the vessels were in, it was entirely practicable for the tug to direct her course to starboard or to port and pass the schooner on either side. Until that time the schooner could not tell which course the tug would take, no blast of the tug's whistle had given any indication as to the latter's intentions, and there was nothing else to indicate them. Down to that time apparently the schooner was not in fault for keeping her course.

As soon, however, as the tug's green light was shut out, the schooner was sufficiently advised that the tug was about to pass on her port side, manifestly so close that, with the tow in the position which a lookout would have seen, collision was inevitable unless the schooner took some action. It was *then* the duty of the master to act promptly. Did he do so?

He certainly delayed some appreciable period of time, for he did not order the helm hard aport until just as the tug came abreast of his bow.

The two vessels, approaching each other at the rate of 7 knots an hour, had covered 300 or 400 feet while the master of the schooner was deciding what to do. The delay was short—a fraction of a minute —but even that delay may have made impossible an escape which otherwise might have been secured. Had the schooner committed no other fault, we might be astute to find excuse for a delay so brief. But, on the contrary, she was confessedly guilty of a very grave fault, navigating without a lookout, and in consequence of failure to keep a lookout, uninformed as to the location of the tow. The burden is on her to show that such fault did not contribute to the collision, and in view of her master's failure to act promptly, when he did learn of the danger that impended, we are not satisfied that she has sustained that burden.

We conclude that both vessels were in fault. Since the schooner was a total loss, this conclusion calls for no different disposition of the second suit—by the insurance company to recover for loss of cargo. That decree is therefore affirmed with costs of this court to libelant.

[5] In the other suit, neither side has fully prevailed. The appellant undertook not only to show that the schooner was in fault, but also to show that the tug was free from fault. The appellee has sustained only so much of the decision below as found the tug in fault. He has not defeated the contention that the schooner was also in fault. Neither side, therefore, is entitled to costs of the appeal.

The cause is remitted to the District Court, with instructions to modify the decree to conform to the views expressed in this opinion.