## THE PIEDMONT.

### THE NO. 25.

#### (Circuit Court of Appeals, First Circuit, April 6, 1917.)

#### No. 1193.

Collision ⬅️95(7)—Schooner and Tow—Length of Tow—Special Circumstances.

A schooner in Vineyard Sound in the daytime, taking a course practically parallel to and half a mile to windward of a tug with three barges in tow, after proceeding a mile or so, crossed the towline of the leading barge and came into collision with it. There was a strong wind which drove all the vessels to leeward. There was testimony that the tug changed her course toward that of the schooner, and also that the sagging over of the schooner brought her course in convergence with that of the tug. *Held* that, whichever was in fault in that respect and without regard to which was the privileged vessel, the tug was in fault for using hawsers which made her tow more than twice the length permitted by the regulations adopted under authority of Act May 28, 1908, c. 212, §§ 14, 15, 35 Stat. 428, 429 (Comp. St. 1916, §§ 7969, 7970), and that the schooner was also in fault for not keeping a lookout and taking such action as was necessary under the special circumstances to keep her at a safe distance from the tow.

[Ed. Note.—For other cases, see Collision. Cent. Dig. §§ 200–202.]

Appeal from the District Court of the United States for the District of Massachusetts; Jas. M. Morton, Jr., Judge.

Suit in admiralty for collision by Lewis Holmes, owner of the schooner Henry D. May, against the tug Piedmont and barge No. 25; the Consolidation Coal Company, claimant. Decree for libelant, and claimant appeals. Reversed.

J. Walter Lord, of Baltimore, Md. (Theodore Hoague, of Boston, Mass., on the brief), for appellant.

Edward E. Blodgett and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., for appellee.

Before DODGE, Circuit Judge, and ALDRICH and HALE, District Judges.

DODGE, Circuit Judge. This case arises out of a collision between the appellee's schooner Henry D. May, and the appellant's barge No. 25, on the morning of October 14, 1913, not more than a mile and a half from Pollock Rip Lightship, in a general direction toward Shovelful. The barge was at the time one of three coal-laden barges, all being towed in line by the appellant's tug Piedmont, and was the barge following next after the tug. The libel, which claims damages for injuries sustained by the schooner, is brought against both tug and barge.

The collision was in the daytime, and in weather clear, though overcast. A wind from the N. or N. by E., of moderate to strong gale force, was blowing and had been blowing all night. It had caused the tug and barges, which were bound for Boston around Cape Cod, to turn back, after passing Nauset, for shelter in Vineyard Sound. They had returned through the Slue, rounded Pollock Rip Lightship, and thereafter headed for Shovelful Lightship, before the collision.

The schooner, a three-masted vessel, bound over the Shoals for New York, had been not far behind the tug and barges during their return through the Slue. Loaded with lumber, and her draft permitting, she passed to the northward of the gas buoy opposite Pollock Rip Lightship, instead of going, as the tug and barges did, between it and the Lightship; after which, coming up into the wind, she headed for Shovelful Lightship on the starboard tack, close-hauled, or nearly so. Just before doing this she had lost her flying jib and had set her spanker, reefed, carrying also thereafter only her foresail, forestaysail, and jib.

Shovelful Lightship is distant from Pollock Rip Lightship 3½ miles, the direct course from the latter to the former being W. by N. ⅝ N., according to Eldridge's Chart. The heavy wind to which the starboard sides of vessels pursuing this general course were exposed made it impossible for the tug and barges, and for the schooner as well, to proceed in the desired direction without making considerable leeway.

The schooner, thus adopting a course toward Shovelful not far from parallel with that adopted by the tug and barges, was, at the time she hauled up on said course, as above, considerably to the windward of their course. As the vessels proceeded, the schooner came in some manner to be between the tug and the barge, over the hawser connecting them, and ahead of the barge, which struck her stern; she thereafter went off to leeward of the tug and barges, anchored, filled with water, and was ultimately left at anchor by her master and crew, near the Stone Horse Shoal.

The respective courses toward Shovelful, parallel or nearly so, as above, originally adopted by the tug and barges, and by the schooner as well, near Pollock Rip Lightship, involved no risk of collision if duly adhered to on both sides. The course which is claimed to have been that which both parties were then steering, and intending to pursue as nearly as possible, was W. N. W. Without a departure from these original courses, on one side or the other, or on both sides, changing a situation of safety to one of danger, the schooner could not have come to be in the position above referred to, between the tug and barge, over the towing hawser and in the barge's way; a situation escape from which without collision was hardly possible. The question to be determined is: Upon which side was the negligence through which said situation was brought about?

On the schooner's behalf it is contended that the burden of avoiding collision, and therefore of excusing the collision which happened, is on the tug and barge, constituting (with the other barges) one vessel under steam, and therefore bound by article 20 of the applicable Inland Rules (Act June 7, 1897, c. 4, § 1, 30 Stat. 101 [Comp. St. 1916, § 7894]) to keep out of the way of sailing vessels. If this rule governed the case, as the District Court held, the schooner was bound to hold her original course without change.

On behalf of the tug and barges it is contended that the schooner was an overtaking vessel as to them all, bound by article 24 (Comp. St. 1916, § 7898) to keep out of their way, and under the burden therefore of excusing this collision. Assuming this as the governing rule, the tug and barges were bound to hold their original course without change.

Whether the duty of maneuvering, if necessary to avoid collision, was on the tug and barges or on the schooner, under the rules, an alteration of or departure from the original course on the part of either in the direction of the other's course, would have been a maneuver tending in no way to avoid, but, on the contrary, to incur danger of collision, and therefore, in any case, fault contributing to the collision, and, on the part of the privileged vessel, whichever of them it may have been, such alteration of the original course would have been fault bringing about the collision, as is equally obvious. Without determining, therefore, which side was bound to keep clear, and which entitled to claim privilege, under the above Inland Rules, it is believed sufficient to inquire only by which side does the conflicting evidence show that change of course to have been made which placed the schooner in the position above referred to, relatively to the tug and barge, and thus brought about collision between them. The circumstances, as will appear, are shown by uncontradicted evidence to have been such as forbid holding the tug and barges in fault merely for failure on their part so to change their course as to head more away from the schooner's.

The libel alleges that the Piedmont suddenly changed her course to starboard and pulled directly across the schooner's course. These allegations are denied in the answer. The finding of the District Court was that the Piedmont did make such a change, in order to avoid risk of collision with another tug, called the Donahue, also towing three barges in line toward Shovelful, and which, after preceding the Piedmont through the Slue, had been carried to leeward and was heading across the Piedmont's course in an attempt to get herself and her barges further to windward. The pleadings make no reference to the Donahue or her barges. The appellant contends that the above finding was unjustified on the evidence.

The evidence is much in conflict, and on neither side can it be called very clear or satisfactory upon any disputed question. Nearly 11 months had passed since the collision, before any of it was taken. On September 5, 1914, the libelant took the deposition of the schooner's mate. On November 24, 1914, the claimant took the deposition of Capt. Quinn, master of another tug (the Nottingham), who saw the collision from on board her. The hearing was on December 1, 1914, at which the remaining witnesses gave their testimony in person.

The libelant's evidence tending to prove such a change of course on the Piedmont's part as the libel alleges came in part from witnesses who were on board the schooner. Only two such witnesses testified— her master, who was all the time at the wheel, and her mate, as to whose position or doings after the schooner was headed for Shovelful nothing definite appears, except that he was on the deckload amidships, and engaged, or part of the time at least, before the collision, in getting out fenders with the rest of the crew. The crew is said to have consisted also of three colored seamen and a cook; but no testimony from any of these men was before the court.

The testimony from the schooner's master and mate regarding the Piedmont's alleged change of course can hardly be called definite or convincing. It is unsupported by any testimony from a specially de-

tailed lookout performing that duty at a proper station on the vessel forward, because the schooner entirely fails to show that she had any such lookout. The master said in cross-examination that the mate was detailed as lookout; the mate, however, said on cross-examination that there was no one so detailed.

The claimant's testimony that no such change of course was made by the Piedmont came in part from witnesses on board the tug and barges. The master of the tug, in her pilot house until just before the collision, denied that, at any time before the schooner had come in between the tug and barge, he ever changed the W. N. W. course toward Shovelful, or made any attempt to haul off to starboard, or that he was ever closer than half a mile to the Donahue. Although that tug and her barges was ahead of his tug and across his course, he had not, as he testified, got near enough to her to require any change by him. With him in the pilot house were the second mate and man at the wheel, neither of whom testified, nor another man said by him to have been on lookout on the tug, but aft at the time, watching the towing hawser. The tug's engineer was a witness, but, having been below at the time, made no statement bearing on the matter now under consideration. The master of the colliding barge (No. 25) testified that he was watching the Piedmont in order to follow her properly; that he saw the Donahue ahead of her, but that she made no change after once taking up the course for Shovelful; and that his barge made no change. Although he saw the schooner cross the hawser between him and the tug, he did not know at the time, according to his testimony, that his barge struck her, but thought she had gone clear. There was no other witness from on board his barge.

One witness only was called by the claimant from on board each of the two other barges composing the Piedmont's tow. The master of the second barge from the tug (No. 10) occupied on her deck forward, after the turn had been made at the Lightship, in setting sail on her with two other men, said that the tug never changed her course at any time until the schooner crossed her hawser. The master of the third barge from the tug (No. 9), though in his pilot house and steering after barge No. 10, did not see what happened, and did not undertake to testify to any change, or absence of change, in the tug's course.

If the result were left to depend solely upon the evidence thus far referred to, it might well be doubted, even upon the assumption that the burden of proof was on the tug, in view of the character of the evidence from the schooner and her failure to show that a sufficient lookout was kept on board her, whether the above conclusion reached by the District Court was justified. But upon the issue whether any such change of course was in fact made by the tug, or not, neither side relied wholly upon testimony coming from the vessels immediately involved.

The libelant relied also upon testimony by Murphy, master of the schooner Herrick, anchored at the time further toward Stone Horse Shoal, at a point half a mile to a mile away from the place of collision. After describing the Piedmont as approaching, just before the collision, another tug towing barges (the Donahue), he said:

"It looked to me as though this towboat [the Piedmont] was pulled over toward the northerly, and this vessel [the schooner] came between the towboat and the barge [No. 25]."

On the other hand, the claimant relied also upon testimony by Quinn, master of the tug Nottingham, and Kelley, keeper of the life-saving station on Monomoy Point. The Nottingham, also towing three barges, had been following the Piedmont and her barges through the Slue, and was at the time following after them toward Shovelful on a course somewhat to leeward of theirs. Capt. Quinn, claiming to have watched all that happened from on board her, said he saw no change of course on the Piedmont's part. Capt. Kelley, claiming to have seen all that happened from his lookout tower, about three miles away, with the aid of glasses, said that the Piedmont did not turn to starboard at all, but kept right on her course to Shovelful, except that she stopped and fell off to leeward just before the schooner and barge came together.

As to Capt. Kelley, there was evidence tending to show statements made by him since the collision at variance with his testimony in court. But, without discussing this evidence in detail, or other evidence relied on by either side to impeach, qualify, or affect testimony introduced by the other, we are unable, after careful consideration of the whole evidence, to find sufficient ground for adopting a conclusion contrary to that reached by the District Court, before whom all the witnesses except the mate of the schooner and Capt. Quinn testified in person. We further agree with the District Court in holding the tug and tow in fault in any case, because of the length of the hawsers upon which the barges were being towed at the time, which was such as to make the total distance from the tug to the rear barge some three-quarters of a mile, more than twice the length permitted by the department regulations established under statutory authority. 35 Stat. 428, 429. We agree with the District Court in finding the evidence insufficient to excuse so gross a failure to obey the regulations, and as insufficient also to show that the failure could not have contributed to bring about collision.

Holding the navigation of the tug and barge as above to have been the "direct and sole cause of the collision," the District Court exonerated the schooner; and it remains to determine whether or not the evidence justified this result.

Assuming the duty of avoiding her to have been upon the tug and barges, as the District Court held, they had a right to expect the schooner, after taking up her course for Shovelful, parallel with theirs, to adhere to that course, so far at least as was necessary to prevent any approach into dangerous proximity with theirs. If, as there is evidence tending to show, she failed to do this, and let herself be carried on a course constantly converging toward theirs, the nearer she came to their course the more she increased the risk of collision, by her own fault. That the Donahue and her barges were in such a position relatively to that of the Piedmont and her barges as made any change to port on the part of the latter dangerous for both towing fleets was known to the schooner's master and mate, as sufficiently appears from

their testimony. Under such circumstances, if the schooner found herself unable to keep to her original course, safely parallel with that of the tug and barges, and unavoidably carried instead upon a course so converging with theirs as to involve dangerous proximity if persisted in, we think the case was one of special circumstances, due regard for which required her, under article 27 of the Rules, to take in time some action to arrest or prevent any closer approach, even though not herself otherwise charged with the whole duty of keeping clear.

In its answer the claimant alleged that, although the course toward Shovelful first adopted by the schooner was to windward of the tug and tow's course and nearly parallel therewith, she afterward appeared to lose her headway or become unmanageable, and finally kept off as if to cross the bow of barge 25. As appears from the opinion, the claimant contended in the District Court that the schooner was being driven to leeward by the wind and lost her flying jib just prior to the collision, which loss caused her to become unmanageable and pay off to leeward. The court held, however, that she lost her flying jib, not after she had laid her course for Shovelful from the Lightship, but before she had passed out of the Slue between the buoys, and that she was at the time of the collision holding her course with no more leeway than was to be expected.

We find no sufficient ground for disagreeing with the conclusion that the schooner lost her flying jib before, and not after, she had come upon her W. N. W. course toward Shovelful. While it may well be true that she thereafter held her course with no more leeway than was to be expected under all the circumstances, that she made more leeway than the tug and barges, under her shortened and scanty sail, from that time until the collision, can hardly be doubted in view of her own evidence. According to her master, at her wheel, she fell off whenever the wind baffled, heading to windward again when a heavy spell would strike. He claims to have kept her headed for the Shovelful Lightship all the time, but he says it was bearing one point on his weather bow when he first noticed the tug turning to the northward. Once he intentionally let the schooner come into the wind, in order to see whether she would come about or not, letting her fall off again after he found that she was not likely to do so. Neither in his testimony nor in that of the mate do we find sufficient reason for doubting the statement by Capt. Quinn, who was following in the Nottingham, that after passing the buoys, changing her course so as to head toward Shovelful and thereafter getting into the wind, the schooner "sagged right over for the Piedmont's tow." Failing, as she does, to show that a proper lookout was maintained on board her, the schooner is in no position to contradict the testimony from the tug and barges, thus supported, that between the buoys and the place of collision the course she actually followed constantly converged toward theirs.

Whether, at the point where she took up her course toward Shovelful, the schooner was abreast barge No. 25, or further astern relatively to the tug and barges, and whether the place of collision was within a mile of Pollock Rip Lightship or about a mile and a half distant there-

from, are disputed questions, regarding which satisfactory foundation for a definite conclusion can hardly be found in the evidence. Whatever the schooner's previous speed in comparison with that of the tug and barges, her speed while heading toward Shovelful, and while navigating as above, can hardly be supposed to have materially exceeded theirs. We think that the careful observation on her part demanded by the circumstances would necessarily have enabled her to discover in time that persistence upon a course such as that upon which she was being carried, involved constantly increasing risk of collision or entanglement with the tug and barges, and that they were not free so to alter their course as to diminish that risk materially. If there is evidence tending to show that the schooner could not have tacked, there is none to show that she could not have anchored in time, as other sailing vessels not far off had done, and as she herself did after the collision. Not only did she persist in keeping on as above toward the course of the tug and barges, without any properly stationed lookout, but her evidence fails to show any such careful and constant observation on her part, meanwhile, as she ought in any case to have maintained, and as was especially requisite in view of her own inability to keep herself at a safe distance from them and the obvious limitations upon their power to maneuver with regard to her.

In The Mary E. Morse (D. C.) 179 Fed. 945, and The Helen (D. C.) 204 Fed. 653, and 230 Fed. 601, 145 C. C. A. 11, a schooner was, as here, approaching by daylight a line of barges towed by a tug, on a course converging with theirs. She had a properly stationed lookout, besides having all hands on deck, and kept a careful and constant watch upon the movements of the tug and barges for the purpose of performing her duty of avoiding collision with them. Even if not charged with that duty, we think that the circumstances shown in this case required no less vigilance in the matter of lookout on the part of the libelant's schooner. While her failure to exercise such vigilance might not necessarily have been by itself contributory fault on her part, it leaves her unable under the circumstances here shown to prove that collision could not have been escaped had there been no such failure, and unable therefore to establish the conclusion that the collision was solely due to the tug's change of course to the northward. We are therefore unable to hold the schooner altogether exonerated. See Eastern, etc., Co. v. Winnisimmet Co., 162 Fed. 860, 862, 89 C. C. A. 550; The Anna W., 201 Fed. 58, 119 C. C. A. 396.

When the schooner got so close to the hawser connecting the tug and barge that she could not avoid striking or crossing it, the tug slackened her speed to let her cross without fouling it, as she did by falling off herself from the wind. We cannot, however, hold either vessel in fault in respect to any of these last maneuvers, adopted as they were at the last moment, after a situation had been reached which so inevitably led to immediate collision.

There being nothing to show independent fault on the part of the barge, whose movements were wholly under the tug's control, we think the result required by the evidence is that both schooner and tug were to blame for the collision.

The decree of the District Court is reversed, and the case is remanded to that court, with directions to enter a decree dividing equally the damages and the costs in that court, and the appellant recovers its costs of appeal.