**LUCKENBACH S. S. CO., Inc., v. UNITED STATES.**

**UNITED STATES v. THE MATHEW LUCKENBACH et al.**

District Court, S. D. New York.

Feb. 7, 1945.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and A. Howard Neely, both of New York City, of counsel), for Luckenbach Steamship Co., Inc., and the Mathew Luckenbach.

John F. X. McGohey, U. S. Atty., of New York City (Alfred T. Cluff, Sp. Asst. to U. S. Atty., of New York City, of counsel), for the United States.

MANDELBAUM, District Judge.

These are two actions in Admiralty, by way of cross-libels, which deal with a collision on October 21, 1942, between the Mathew Luckenbach, hereinafter called "Mathew," a single screw steel freighter, 450 feet long, owned and operated by the Luckenbach Steamship Company, Inc., carrying a cargo of steel and army supplies, and the "Zacapa," a single screw steam freighter, 394 feet long, owned by the United Fruit Company, but operated by the United States, carrying a cargo of military explosives. Serious damage was sustained by both vessels. The entire testimony of the actions consists of about 470 pages of depositions.

The two vessels involved in this collision were part of a convoy of about forty-seven vessels bound for the United Kingdom, travelling at eight to nine knots, and in a black-out condition, pursuant to Navy orders. The convoy was made up in thirteen columns of three to four vessels in each column. The distance between the columns was five cables or 3,000 feet, and between vessels in the same column, two cables or 1,200 feet. The "Mathew" was the fourth vessel in the third column (No. 34), and the "Zacapa" was the third vessel in the fourth column (No. 43). The vessel in front of the "Mathew" was a whaling vessel (No. 33). Stationed astern the "Zacapa" was the "Esso Bayway" (No. 44).

The convoy was proceeding at a rate of about eight or nine knots when the impact occurred. The bow of the "Zacapa" struck the starboard side aft of the "Mathew." Both vessels were thereupon obliged to leave the convoy and proceed to Halifax for repairs.

Each of the parties herein maintain strenuously that they were in position and travelling on course. The impact occurred at approximately 5:36 A. M. Mathew time, and 5:31 Zacapa time. The "Mathew's"

witnesses claim that visibility was good, and that a silhouette of a vessel could be seen from one-half to three-fourths of a mile. The "Zacapa's" witnesses testified that visibility was good, except that a cloud formation was building up on the port side, making objects on that side obscured. A witness from the "Esso Bayway" testified that visibility wasn't any too good, but was something better than 500 yards.

The testimony of the "Mathew's" witnesses, in substance, is, that a look-out was stationed on the flying bridge; that there was no look-out on the forecastle head or bow; that at the time of the collision she was attempting to regain her position, having previously fallen back; and that for thirty minutes prior to the collision, the "Mathew" was travelling at full speed, some 11 or 12 knots; that at 5:25 A. M. the engines were reduced to one-half ahead, at 5:33 slow ahead, and at 5:35 the engines were stopped altogether. That the reason stated for slowing down and stopping the engines, was to avoid coming too close to the whaler which was estimated then to be about 150 feet away. That the "Mathew's" look-out sighted the "Zacapa" astern, coming at a right angle and approximately 120 to 150 feet away, and that the "Matthew's" Chief Officer, when so notified, left his station and ran to the lower wheel house and rang the general alarm. The impact occurred forty-five seconds after the alarm bell was rung. The testimony of the "Zacapa's" witnesses, in substance, is that a look-out was on the forecastle head; that prior to the setting of the moon, between 4:00 and 4:30 A.M., the two vessels ahead of the "Zacapa" could be seen; that at no time was the "Zacapa's" speed substantially changed, except at 5:00 A.M. when a convoy increase was ordered, and, that at no time did the "Zacapa" change course. The "Mathew" was first sighted by the Chief Officer, off the port bow, and he was unable to determine the course of the other vessel, since only the funnel was visible. He ordered a hard right and rang the telegraph full astern. He soon made out the other ship and noted that this was a crossing situation with the other vessel crossing from port to starboard. He immediately ordered the engine hard left and full astern again. The time between the hard right and hard left was estimated at about ten seconds. The distance of the "Mathew", when first sighted, was about 200 feet. The collision occurred between forty seconds to a little more than a minute, from the time of sighting her. Until the Chief Officer gave the orders to change course and reverse engines, the look-out saw nothing. The Chief Officer testified, that if the look-out had sighted the "Mathew" one-half minute earlier, and if the engine had been full astern one-half minute earlier, a collision might have been averted.

A witness from the "Esso Bayway," stationed astern the "Zacapa," testified that when the "Zacapa" was seen to make a sharp right, the "Bayway" went to the "Zacapa's" port and fell in behind the tanker, No. 42, thus putting the "Bayway" in the same position that the "Zacapa" had previously occupied.

Mr. Zeuner, Chief Officer of the "Esso Bayway," testified, that it was not until later, that he knew of the collision, and that prior to this occurrence, at about 4:00 A.M., the "Mathew Luckenbach" was on his port beam.

At no time before the collision or thereafter did either vessel turn on her lights, nor were any signals sounded by the "Zacapa" when her course was changed. The "Mathew," at the time of the impact, although her engines were stopped, still maintained about five knots way.

Taking all of the testimony in the light of what subsequently happened, it is clear that one or the other of the two colliding vessels was off course and out of station. If the testimony of the "Mathew's" witnesses is to be believed, it would appear that the "Zacapa" stationed in column 4, some 3,000 feet abeam of the whaler in column 3 and 1,200 feet ahead of the "Mathew," wandered out of position, went port of its column, wandered into the third column in which the "Mathew" claims she was stationed, and struck the "Mathew" on her starboard side aft. The probability of this

having occurred is too far-fetched, in view of the evidence taken as a whole. While corroborating evidence exists to show the "Zacapa" substantially in her proper station and on course, no such evidence is submitted on behalf of the "Mathew." In fact, testimony exists to show that the "Zacapa" was in line, because when the "Bayway" passed her, she assumed the position of the "Zacapa" behind the tanker. The contention of the "Mathew" that possibly all three, the "Bayway," the "Zacapa" and the tanker were out of line, seems untenable. The more logical conclusion that must be drawn, is that the "Mathew," in attempting to regain her station, passed the "Bayway" and "Zacapa" in the fourth column and wrongfully identified the tanker as the whaler in the third column. I can therefore give little credence to the testimony of the "Mathew's" witnesses as regards her course at the time of the impact.

The primary fault appears to be with the "Mathew" for being out of position. See The Hopemount, 1943, 75 Lloyd's List L.R. 94. A further fault would be her failure to show lights or failure to take any action in respect to change of course. Moreover, the Chief Officer in leaving his post and running down to another deck to ring the general alarm and his impression that there was no time to do anything else, is more than bad judgment. If prompt action were exercised, perhaps the "Mathew's" stern could have been swung away and the collision averted.

On the other hand, the "Zacapa" is not itself free from contributive fault, for failing to maintain a competent look-out, and the testimony of the "Zacapa's" Chief Officer in this respect, makes clear the failure to provide a vigilant look-out. As previously stated, by the Chief Officer, if the look-out had reported a half minute earlier, and he had put the engine full astern a half minute earlier, the collision might have been averted. The "Zacapa's" look-out reported nothing at all, when, according to the facts, visibility far exceeded the distance between the vessels when each was first sighted. This was not the case of a vessel coming from astern, but one whose bow crossed that of the "Zacapa", and the crossing vessel, in my opinion, should have been seen by him.

As stated by the Court, in The Buenos Aires, 2 Cir., 5 F.2d 425:

"The want of a competent look out properly stationed and vigilant is a fault in a vessel as a result of which she assumes the consequential risk of a collision to which the fault contributed. The Anna W., 2 Cir., 201 F. 58, 119 C.C.A. 396; The Greystoke Castle, D.C., 199 F. 521; Graves v. Lake Michigan Car Ferry Transportation, 7 Cir., 183 F. 378, 105 C.C.A. 598; The Volund, 2 Cir., 183 F. 413, 105 C.C.A. 647" 5 F.2d at page 432.

In The Paris, D.C., 37 F.2d 734, affirmed 2 Cir., 44 F.2d 1018, it was stated by the Court, at page 739 of 37 F.2d:

"The law further imposes a rigid obligation on a moving vessel to maintain a careful, vigilant, and effective look out, whose duty shall be both to observe and to report."

This requirement becomes doubly important when ships travel in convoy, close together and under black-out conditions.

I must also find both vessels at fault for failing to show lights when each sighted the other.

When confronted with a situation of special circumstances such as the imminent danger of collision, it is the duty of a vessel, even when proceeding without lights pursuant to orders of the Navy, to promptly turn on her running lights to warn the other vessel of her position and heading. The Corozal-Daniel Pierce, D.C., 62 F.Supp. 123, 1944 A.M.C. 778, 782, citing The Cushing, D.C., 266 F. 570, affirmed 2 Cir., 292 F. 560, and authorities in England to the same effect.

I cannot agree with the "Zacapa" that the major and minor fault rule has any application in the instant case, because of the above faults displayed.

The failure of both vessels in the respects above described, places equal blame on both. I am satisfied from the evidence, that the failure of the vessels in question

to take proper precautions resulted to some extent in the damages caused.

The Court makes the following findings of fact and conclusions of law:

### Findings of Fact

1. At about 5:30 A.M. on October 21, 1942, while proceeding toward the United Kingdom in convoy, a collision occurred between the "Mathew Luckenbach" and the "Zacapa."

2. The collision occurred in line with the fourth column, the bow of the "Zacapa" striking the starboard side aft of the "Mathew Luckenbach" at almost a right angle.

3. The "Mathew Luckenbach" at the time of the impact was out of station. Her engines were at a standstill and her course was almost at right angles to the course of the convoy.

4. Visibility was good, but when each of the vessels sighted the other they were about 150 to 200 feet apart.

5. The officer in charge of the "Mathew Luckenbach" made no effort to change course or take any other avoiding action when the "Zacapa" was sighted.

6. The look-out on the "Zacapa" was not vigilant because he failed to observe the "Mathew Luckenbach" crossing the bow of the "Zacapa" which was well within the limits and angle of his vision.

7. Neither of the vessels showed lights or sounded signals.

### Conclusions of Law

1. The "Mathew" was at fault for being out of station and off course.

2. The "Mathew" was at fault for failing to take any avoiding action and for failing to show lights.

3. The "Zacapa" was at fault for failing to maintain a competent look-out.

4. The "Zacapa" was further at fault for failing to show lights or sound a signal to indicate change of course.

5. The damages should be divided.

A decree may be entered accordingly with reference to a Commissioner as to the amount of damages.