## THE DAVID C. RITCEY.

### THE L. V. STODDARD.

#### (District Court, E. D. Pennsylvania. April 29, 1915.)

#### Nos. 52 and 53.

COLLISION ☞45—STEAM AND SAILING VESSELS—FAILURE TO MAINTAIN EFFICIENT LOOKOUT.

A collision at night outside the Delaware Capes between a steamship passing out and turning to the northward around the Five Fathoms Bank lightship at a speed of 9 miles an hour and a schooner approaching from the northward at 3 miles an hour *held* due solely to the fault of the steamship in failing to sooner see the lights of the schooner, which were burning brightly; the evidence showing that the schooner kept her course, that the night was clear, and that she saw the lights of the steamer, as they approached the lightship on courses approximately at right angles to each other, in ample time for the steamship to have kept out of her way.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 51; Dec. Dig. ☞45.]

In Admiralty. Suit for collision by Colin D. Ritcey, master and part owner of the British schooner David C. Ritcey, against the steamship L. V. Stoddard, Boston & Virginia Transportation Company, claimant, with cross-libel against the Ritcey. Decree for libelant.

Howard M. Long, of Philadelphia, Pa., for the D. C. Ritcey.

Harris Livermore, of Boston, Mass., and Arthur E. Hutchinson, of Philadelphia, Pa., for the L. V. Stoddard.

DICKINSON, District Judge. This controversy involves the consequences of and the responsibility for a collision between two vessels. The case has taken the form of two actions, a libel and a cross-libel. It was stipulated between the proctors of the parties that the cross-libel should be considered as an answer to the libel, and the libel in its turn an answer to the cross-libel. The evidence was introduced, testimony given, and case heard as if the cases were in fact one case. We therefore dispose of it as such.

The original libelant's vessel is of fore and aft rig and of the type of vessel known as a three-masted coasting schooner or coaster. The schooner has a length of 126 feet and a carrying capacity of 550 tons. The original respondent is a steamer having a length of 250 feet and was of a tonnage of 3,700 tons. The speed of the vessels at the time of the collision was about three miles per hour for the schooner and nine miles for the steamer. The first thought with which one is impressed is the contrast in size and power of the vessels. The steamer

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

had twice the length, three times the speed, and nearly seven times the tonnage capacity of the schooner.

The collision occurred on November 18, 1914, at about 9:45 p. m. The steamer was outward bound through the Delaware Capes. Her destination after passing out was to the northward. The schooner was passing southward along the New Jersey coast and bound to Philadelphia. The place of the collision was near the Five Fathoms Bank lightship, about the point where outgoing vessels bound north turn to go up the coast. The second thought with which any one passing upon such a controversy as this is impressed is that the locality is fraught with danger of collisions, with a knowledge of which the steamer, and indeed both vessels, are chargeable.

The night was clear. Each vessel was carrying its proper lights, all of which were burning brightly, and there were no other craft in the vicinity to confuse the navigators on either vessel. If the testimony of those aboard the respective vessels is to be credited, a sharp lookout was being kept by each. There was ample sea room, and indeed on one side the wide expanse of the Atlantic in which the vessels could maneuver. This forces upon us the third thought, that a collision under such circumstances must be the fruit of negligence in the management of one of the boats or both of them.

The case presents the not unusual feature that each represents itself as the victim of the other; the schooner alleging that it was run down by the steamer, and the steamer that it was run into by the schooner. There lies upon the surface of the controversy the suggestion that it can be easily understood how the schooner, without any fault on its part, might have been run down by the steamer; but the query arises how the steamer, without fault on its part, could have been run down by the schooner. Certainly if the schooner had been trying to ram the steamer, and those on board the latter had been on the alert, it is difficult to understand how the schooner could have accomplished her purpose. The commander of a naval vessel, who under like conditions suffered his ship to be thus lost or damaged, would have been promptly disciplined by his superiors.

We therefore do not need the aid of the rules of navigation to realize that the steamer must make out a clear case of exculpation of itself before the mind could rest easily upon the conviction that the schooner was wholly at fault. The steamer has, however, essayed this somewhat difficult task. It is aided in this by the diagram drawn by witnesses for the schooner illustrating what they described to have been the course of the steamer before the collision. This course, as delineated by these diagrams, gives one the impression that the witnesses assert that the steamer, without any reason for so doing, rounded Five Fathoms Bank lightship and immediately swung around to a return course which almost paralleled that which she had been before pursuing. That the steamer should have taken a course involving such a turn as that described is at first sight incredible. No one, however, can read the testimony of those who were aboard the schooner, and indeed aboard the steamer as well, without having the firm conviction, after its perusal, that the collision did occur substantially as

is stated on behalf of the schooner. These seemingly inconsistent impressions are reconciled, if the thought is added that the witnesses who were on board the schooner are describing, not the course which the steamer traversed before the collision, but their inference of what the course was from the position of the vessels shortly after the collision, which was the time at which the witnesses took their mental picture of what had happened.

Without going into any discussion in detail of the facts testified to and which are in evidence, we have no difficulty in reaching a satisfactory conclusion as to the why of this collision. As the steamer was passing out of Delaware Bay with the purpose in mind of passing to the southward of the lightship and then turning to the northward in a course headed for the Northeast End lightship, she was intending to take a course which substantially paralleled in reverse that which the schooner was taking, with the purpose in her mind of passing to the eastward of Five Fathoms Bank lightship and then turning into the bay, in a course which in turn would have paralleled in reverse the course which the steamer had pursued in passing out. As each vessel was approaching the common turning point, they were pursuing courses which were approximately at right angles to each other. It is clear from this statement that it was the duty of the schooner to have held her course and of the steamer to have kept clear of the schooner. The position of the schooner was such with respect to the lightship, which the steamer first reached, that the steamer would be expected to pass with the schooner on her port side. Had those aboard the steamer seen the schooner's lights as soon as those aboard the schooner made out the steamer's red light, this is the course which the steamer would without doubt have taken. Instead of doing this, the steamer passed to the eastward across the line of the course which the schooner was taking, so as to make her bear off the schooner's port bow. The helm of the steamer was then put to starboard, with the thought in the mind of her navigator to have her round the lightship and swing to the northward until she was steadied on her course up the coast, which would have been N. E. by N. or ½ N.

Up to this time those aboard the steamer, for some reason which is unexplained, had not as yet made out the schooner. The steamer had not been steadied on her new course when the schooner was made out, but was still swinging when the danger of a collision was forced upon the attention of those in command of the steamer. The inquiry was made, "How is your helm"? and the answer was given, "Hard astarboard." The command then followed, "Keep her so." The reasons which governed this action are manifest. The steamer was swinging to port on a starboard helm when the schooner was made out. The schooner was so near at hand that the attempt to check the swing of the steamer and steady her, so that the vessels could pass port to port, was an extremely hazardous undertaking. The only thing left to do, therefore, was to make the effort to let her continue to swing on her starboard helm in the expectation that she would safely cross the bow of the schooner. In this she failed. This swing, and the checking of her speed from the engine room, and the effect of the collision

itself, would have brought about the position of the vessels to which all the witnesses testified, viz., that they were then side by side, with bows pointing in the same direction. If this idea of the happening is visualized, the testimony of those aboard the schooner is made clear, and its substantial correctness established. The steamer would have showed to them first her white or masthead lights, next her port light, then both red and green lights, and then only the green light, in exact, accord with the testimony. More than this, the at first incredible description of the loop in the course of the steamer is accounted for, · and is seen to be, not merely consistent with the to be expected course of the steamer, but a necessary accompaniment.

This theory of how the collision came about involves the findings of negligence on the part of the steamship and the absence of any negligence on the part of the schooner. The theory of counsel for the steamship that the schooner must have changed her course is a theory of fact, not only not called for by what happened, but also unsupported by anything in the evidence, and flatly denied by the witnesses, whose credibility is enforced by their opportunities for knowledge, and the clearness, frankness, and evident truthfulness with which they have testified. The negligence of the steamer consists in this: The night was of a kind in which lights could be readily made out. The schooner's lights were burning brightly. The steamer's side lights were made out by the schooner at a distance which afforded an ample margin of space for the safe maneuvering of the vessels. There is no ground for finding that the schooner's lights could not have been made · out from aboard the steamer at a distance which would have enabled the steamer to have avoided the collision. There is not sufficient. ground to convict the steamship of negligence in having failed to maintain a lookout, or for mismanagement of the ship after the schooner was made out.

The explanation for the occurrence is found in the two facts that the collision could not have been avoided after the schooner was seen, and she was not sooner seen because the steamer, in coming out of the capes, was headed to the eastward, and the presence of the schooner was not observed until the steamer had made her swing to the northward, thus placing the schooner before the eyes of those aboard the steamer. This explains how the collision came about, but does not excuse the steamer from responsibility for the consequences, nor acquit it of the charge of negligence. The suggestion that the schooner might have avoided the collision by a change of her course, when it was discovered that a collision was close at hand, is readily met. Had the schooner changed her course, it is apparent that the defense would then have been that the collision was due to her having done this very thing. It was the clear duty of the schooner to have held her course, · and nothing but imminence of a collision so great as to have offered no other escape would have justified her in changing it.

Another answer to the suggestion is that the schooner was expecting a pilot boat, and when the steamer showed she was rounding up by changing her course to the westward, it was thought by at least some aboard the schooner, and the mate so announced, that the steamer was

the pilot boat rounding up, so as to lay alongside of the schooner, in order that a pilot might board her.

The other suggestion made, that this error on the part of the schooner in mistaking the steamer for the pilot boat was the cause of the collision, is supported neither by the evidence of what did happen, nor by anything which under such circumstances might be expected to happen, and the fact is found against the steamship. The theory based upon the suggestion of this mistake of the schooner that her captain, intending to lay her alongside the pilot boat when she rounded up, misjudged the distance and ran his vessel into the steamer, has no other support than the ingenious imaginings of counsel.

There would appear to be no controversy over the extent of the damages to the schooner, nor the amount of the expense of her repair.

The usual decrees, finding the steamer to be responsible for the damages done to the schooner, and that the schooner was without fault, may be drafted and submitted by counsel.