## THE CREOLE. *

### THE JAMES WILLIAM.

#### (District Court, S. D. New York. January 17, 1920.)

1. **Collision ⊜43—Obligation of steamer meeting schooner is very great.**

    The obligation of diligence on a steamer which is approaching a schooner to avoid collision is very great, and the higher the speed the greater the care required.

2. **Collision ⊜75—Schooner's light, complying with statute, is sufficient.**

    If the red light of a schooner complied with the statutory requirement that it be visible for two miles, it was sufficient, though the evidence showed the position of the light and the lens were not properly adjusted to give the best results.

3. **Collision ⊜43—Positions and courses immaterial, if schooner could be seen.**

    In determining the liability for a collision between a steamship and a schooner, it is unnecessary to determine just what were the positions and courses of the two vessels prior to the collision, since, whatever their courses, it was the steamer's duty to keep out of the way, if the lights of the schooner could be seen and the schooner's duty to maintain its course and speed.

4. **Collision ⊜75—Schooner's claim that her light was lit just before collision held not sustained.**

    On libel for a collision between a steamer and a schooner, testimony by witnesses for the steamer that just before the collision they saw a red light moving along the schooner's deck *held* insufficient to show that the

schooner's red light was lit just before the collision, since the natural method of lighting would .have been to take the light out from the screen, in which case it would have shown white, not red.

In Admiralty. Cross-libels by the Carmichael Ship Company against the steamship Creole, and by the Southern Pacific Steamship Company against the schooner James William, to recover damages for collision. Decree rendered, holding the steamship solely at fault.

Chauncey I. Clark, of New York City, for the James William.

Robert S. Erskine and Leslie de Grove Potter, both of New York City, for the Creole.

HOUGH, Circuit Judge: There is only one assignable reason for this collision, the Creole did not see the James William in time to avoid her. There are but two possible reasons why the schooner was not avoided: Either her red light was not seen, because it was not there to be seen, or on a fairly good night for seeing lights the steamer's lookouts failed in due diligence.

As to character of the light when lit, I cannot think that there is much difference of opinion. At the very moment of collision the red light was burning, and the Creole's master saw it; and while, as is usual in the case of a steamship commander whose vessel is equipped with. electric lights, he is very contemptuous of the James William's port light, it was in his opinion as good as is usual with schooners, and capable of being seen the statutory distance. In other words, it complied with the law, and no vessel is bound to more.

[1] The obligation of diligence on the steamer is very great; the higher the speed, the greater the care. See The Alaska (D..C.) 22 Fed. at page 552. This case may be stated in the language of The Helen G. Moseley, 128 Fed. at page 404, 63 C. C. A. at page 146.

"Under well-settled principles, unless there can be shown some cause due to the schooner why her red light was not shown to the steamer until in the very jaws of the collision, the conclusion must be that the steamer was in fault."

I take it this puts the burden of proof on the steamer, although I am very loth to dwell much on presumptions or proof burden in collision cases. The position of the steamer is, I think, thus:

(1) The story told from the schooner's deck is so detailed, and shows such extreme care, as to invite suspicion.

(2) The place of collision, as stated by the steamer is impossible of reconciliation with her course as sworn to and her noon position.

(3) Her tack, as observed by the Creole's master at collision, cannot be reconciled with a north-northeast course. Wherefore:

The schooner's testimony is discredited; the maxim, "falsus in uno," etc., should be applied, and the evidence from the steamer's pilot house should be accepted, viz. that the port light was lit almost in the jaws of the collision, and was not seen earlier because it was not there to be seen.

[2] Adverting to the quality of the light for a moment, I think it true that its construction was such as always to have the center of the

flame below the center of the Fresnel lens. This means that the light was not as good as it might have been, considering its size, kind of wick, etc. It was not properly co-ordinated, but I think it was a good red light for two miles and more, and that is all the statute demands.

I am unable to say that I think the story of great care told by the schooner's crew is so uniformly superexcellent as to invite criticism. Any seaman knew that the schooner was in the path of all coastwise traffic, and nothing sworn to is more than or different from what is often done even on merchant vessels.

[3] It is true that the place of collision as given by the schooner seems an impossibility, but I cannot think this is a material point. Errors in scientific or mathematical calculations are not nearly so important as able seamanship in cases of this kind.

As to the courses of the two vessels, I accept as the best evidence obtainable, and as something perfectly natural under the circumstances, that the Creole was steering south 21 degrees west. I think it also plain from the stories of both sides that, if those on the steamer had seen any light on the schooner, it was the red light that would have been visible. The schooner agrees that she was showing a red light, being on a north-northeast course, with the wind about east, which means that the vessels were nearly on opposite parallel courses.

It is, of course, impossible to imagine how on such courses the schooner's red light could ever have been seen on the starboard bow of the Creole almost immediately before collision; and it is equally impossible to imagine how (according to the schooner) the Creole, steering a steady course, could have shown her red light a point and a half on the schooner's port bow, and ever got into collision with the schooner without materially changing her direction.

I find it impossible to reconcile these tales, and do not think it necessary. I arrive at this result because it makes no difference where the schooner was, nor how she was approaching, if she was properly lighted, and there was no fog, and her master had reasonable cause to believe that the steamer could see him; the sailing vessel was justified in maintaining her course and speed, whatever they were. The law requires the steamer to keep out of the way.

[4] Thus the whole case comes down to the question whether the schooner's light, good enough for the law, was lit or relit so soon before the collision as to exonerate the steamer. As to this point it rests on the testimony, or absence of it, of three men: The lookout never saw any light, and I doubt whether he ever saw the schooner until collision. Cadet Cranmer, on the starboard side of the pilot house, saw a red light nearly dead ahead, which "was not stationary, or did not appear to be stationary; appeared to be moving, as if being placed there by some one." Second Officer Schaeder saw a red light at substantially the same location that Cranmer did, and "it appeared to me that it was moving along the deck of the schooner." At this time he thought the schooner "couldn't be more than a hundred yards" distant. Doubtless the light was moving, for the schooner was; but the testimony substantially says that at a distance estimated at a hun-

dred yards or less the light was seen to be moving along the deck of the James William.

There was no fog; on the whole evidence, there was small obstruction to vision on the night in question, and it should have been possible, and indeed must have been possible, to see with considerable accuracy what kind of a light was moving on the schooner's deck, as distinct from merely moving with the schooner.

The running lights of the schooner have been produced; and, while there is no direct evidence on the point, I may assume that the red and green lantern containers are fastened in and to the screens permanently affixed to the schooner's standing rigging. What may be moved for cleaning, filling, and lighting are two lanterns, which are inserted into the containers as night comes on; and these lanterns are round hand lights of white glass; it makes no difference which lantern goes to port and which to starboard. If the port light went out, the natural thing to do in a hurry would have been to take out the lantern and light it. To detach the container from the screen, and lug that heavy and clumsy apparatus, would have taken more time, and should, and I think would, have been seen from the steamer—so short was the time from seeing the light to collision. The quickest thing to do would have been the natural thing to do, especially for a frightened man; and the schooner's crew might well have been frightened at the oncoming steamer. The natural action would have produced a white light moving on the schooner's deck.

The tale from the Creole is not merely of a moving light, but of a moving red light. I cannot believe this story, and must find, despite the number of qualified men who were standing lookout on the Creole, decree in favor of the schooner.

Let one decree be entered; there will be but one bill of costs.