## THE BUENOS AIRES.

### WEST INDIA OIL CO. et al. v. COMPANIA TRANSATLANTICA DE BARCELONA.

(Circuit Court of Appeals, Second Circuit. December 15, 1924.)

No. 63.

**1. Collision ⊙=43 — Sailing vessel privileged vessel as against steamer.**

Under International Rules, arts. 20, 22 (Comp. St. §§ 7859, 7861), a sailing vessel, except when the overtaking vessel, is always the privileged vessel, as against a steamer, and it is her duty to hold her course and speed; a steamer in such case, being the burdened vessel, required to keep out of sailing vessel's way.

**2. Collision ⊙=45—Sailing vessel not at fault because it changed its helm when it became evident that steamer would not keep out of sailing vessel's way.**

Sailing vessel, which changed her helm just prior to collision with steamer, when it became evident that steamer would not keep out of vessel's way, as required by International Rules, arts. 20, 22 (Comp. St. §§ 7859, 7861), held not at fault merely because it changed its helm.

**3. Collision ⊙=43—Steamer required to stop and reverse on discovery of sailing vessel ahead without definite knowledge as to its course.**

Steamer on discovery of sailing vessel ahead, without definite knowledge of its course,

was required to stop and reverse in the face of the manifest danger.

**4. Collision ⬅➡75—Vessel which fails to see lights is liable for resulting collision.**

Vessel's failure to see lights on other vessel, properly set and burning, where due to want of vigilance, renders it liable for resulting collision.

**5. Collision ⬅➡79 — Evidence held to sustain finding that collision between steamer and sailing vessel was fault of steamer in not keeping lookout.**

In libels for damages sustained in collision between steamer and sailing vessel, evidence *held* to sustain findings that lights of vessel, required by Comp. St. §§ 7836–7841, were burning properly, and that steamer was at fault in not keeping proper lookout so as to discover vessel and permit her to hold her course, under International Rules, arts. 20, 22, being Comp. St. §§ 7859, 7861.

**6. Evidence ⬅➡586(3, 4)—Positive evidence entitled to greater weight than negative evidence, on issue whether lights of ship were burning properly.**

Positive evidence of persons on ship that lights of ship were burning properly is entitled to greater weight than negative testimony of witnesses on other vessel that they did not see lights.

**7. Collision ⬅➡108—Sailing vessel held not at fault for directing course to port just before collision with steamship.**

Sailing vessel, sunk in collision with steamer, was not at fault merely because she directed her course to port just before collision, since she was entitled to keep her course in reliance on steamship's duty to keep out of way, and fault committed in attempt to escape from peril of collision was in extremis, and imposed no liability.

**8. Collision ⬅➡77—Duty as to lookout, stated.**

Under International Rules, art. 29 (Comp. St. § 7868), a vessel is bound to have a proper and reasonable lookout placed at point best suited for purposes of hearing and observing the approach of objects likely to come into collision with vessel.

**9. Admiralty ⬅➡28—Spanish vessel held liable in action in rem for death of seamen, in collision due to vessel's fault.**

Under Act March 30, 1920, §§ 1, 4 (Comp. St. Ann. Supp. 1923, §§ 1251½, 1251½c), vessel was at fault was liable in action in rem for death of seamen as result of collision, though such vessel was a Spanish ship and there was no such right of action in rem under the Spanish law.

Appeal from the District Court of the United States for the Southern District of New York.

Consolidated libels by the West India Oil Company and others against the steamship Buenos Aires, her engines, etc.; the Compania Transatlantica de Barcelona, claimant. Decrees for libelants (286 F. 251), and claimant appeals. Affirmed.

This cause comes here from the United States District Court for the Southern District of New York.

A libel was filed by Harold Sturges Rankin, as administrator of the estate of Donald MacDougald, deceased, against steamship Buenos Aires.

A libel was also filed by Harold Sturges Rankin, as administrator of the estate of Gosta Fridolf Persson, deceased, against Buenos Aires Compania Transatlantica de Barcelona.

A libel was also filed by Royal O. Bachman and Bert Penoyer Burgess, as coadministrators of the estate of Julian Bachman, deceased, against Buenos Aires Compania Transatlantica de Barcelona.

There was likewise a libel filed by Thomas Shepard managing owner of the bark Windrush against steamship Buenos Aires, Compania Transatlantica de Barcelona. And there was a cross-libel filed by Compania Transatlantica de Barcelona, owner of the steamship Buenos Aires, against Horace Shepard and others, owners of the bark Windrush.

A libel was filed by the West India Oil Company of New Jersey against steamship Buenos Aires. This suit the libelant brought as owner of the cargo of the bark Windrush.

And these various libels were by an order of the court consolidated into one cause under the name and title of West India Oil Company, steamship Buenos Aires, and bark Windrush. This order was entered on June 28, 1922.

The suits all grew out of a collision between the Buenos Aires and Windrush on the morning of May 10, 1920, which resulted in the loss of the bark, her cargo, and the lives of five of the bark's crew. The collision occurred about 1,000 miles south and east of Sandy Hook. It happened at 2:45 a. m. Windrush time and at 3:15 a. m. Buenos Aires time.

A large amount of testimony was taken, the record covering 1,058 printed pages. A final decree was entered on February 21, 1924. It ordered, adjudged, and decreed to the West India Oil Company the sum of $261,136.47 damages and interest and $203.-45 costs, amounting in all to the sum of $261,339.92. It decreed to the administrators of the estate of Julian Bachman $6,090, damages and costs.

It decreed to the administrator of Gosta Fridolf Persson $3,503.10, damages and costs.

It is decreed to the administrator of Donald MacDougald, $8,589.60, damages and costs.

All these decrees were to carry interest from the date of the entry of the decree until paid.

The cross-libel filed by Compania Transatlantica de Barcelona was dismissed with costs.

From this decree an appeal was taken to this court.

Hunt, Hill & Betts, of New York City (Geo. Whitefield Betts, Jr., and George C. Sprague, both of New York City, of counsel), for appellant Compania Transatlantica.

Bingham, Englar & Jones, of New York City (T. Catesby Jones, of New York City, of counsel), for appellee West India Oil Co.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark, of New York City, of counsel), for the Windrush.

J. Harvey Turnure and Eustace Conway, both of New York City, for appellee administrator.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The collision complained of occurred in the Atlantic Ocean on the morning of May 10, 1920. The steamship Buenos Aires was a passenger steamship carrying 698 persons on board and was on its way from Cadiz, Spain, to New York City. It was a Spanish owned vessel and was proceeding on its course at a speed of about 9½ knots per hour when it discovered the bark Windrush almost directly before it, and which it had not before seen. A collision resulted between the two vessels, and the Windrush was sunk. It was an American vessel built in England in 1892, and classed by Lloyds as 100–A–1. The bark sailed from the port of New York and was bound for the port of Montevideo, Uruguay, with a full cargo of refined petroleum. The whole cargo was lost and five out of eighteen members of her crew were either drowned or died of exposure.

The libels are on behalf of the owner of the bark, the owner of the cargo, and the administrators of the sailors who lost their lives.

The libelants claim that the collision was due solely to the fault and neglect of those in charge of the steamship Buenos Aires.

The steamship alleges that the collision was not due to any fault or negligence on the part of her owners, officers, or crew, but solely to the fault, negligence, and lack of care of the owners, officers, and crew of the Windrush.

[1] The Buenos Aires was the burdened vessel and the Windrush the privileged one. A sailing vessel, except when it is' the overtaking vessel, is always the privileged vessel as against a steamer, and it is her duty to hold her course and speed. Article 20 of the International Rules (Comp. St. § 7859) is as follows:

"When a steam vessel and a sailing vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sailing vessel."

Article 22 of the same rules (section 7861) is as follows:

"Every [steam] vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

[2] See the following cases: The Carroll, 8 Wall. 302, 305, 19 L. Ed. 392; The Illinois, 103 U. S. 298, 299, 26 L. Ed. 562; The Lafayette (C. C. A.) 269 F. 917; The Stifinder (C. C. A.) 275 F. 271; La Boyteaux's Rules of the Road at Sea, 135. The general rule requires a sailing vessel meeting a steamer to keep her course, and it is the steamer's duty to keep out of the sailing vessel's way. "The rule creates a mutual obligation, whereby the sailing vessel is required to hold its course in order that the other may know its position, and not be led into erroneous maneuvers in endeavoring to comply with the requirements of the rule." The Europa (D. C.) 116 F. 696, 698; The Free State, 91 U. S. 200, 23 L. Ed. 299; The Scotia, 14 Wall. 170, 181, 20 L. Ed. 822. In this case the Windrush obeyed the rule and the Buenos Aires disobeyed it. It is true that the Windrush changed her helm. But this she did not do until just prior to collision when it became evident that the Buenos Aires was not observing the rule and would collide with her unless she could in some way make her escape. If the Windrush in the extremity of collision changed her helm, it cannot be attributed to her for a fault.

The rule which requires a steam vessel to keep out of the way of a sailing vessel when proceeding in such directions as involve a risk of collision seems to have been a rule of navigation in the United States as long as steam has been used as a motive power. The reason lies in the fact that the motive power

of the steamer is under human control and is at all times available, while the motive power of the other is not. As was said by Judge Sprague in The Osprey, 18 Fed. Cas. 884, No. 10,606: "The wind bloweth not only where it listeth, but when it listeth. * * * It may suddenly come ahead, or wholly cease; and in the latter case, she [the sailing vessel] would be helpless." And see The Leopard, 15 Fed. Cas. 351, No. 8,264; The Northern Indiana, 18 Fed. Cas. 351, No. 10,320.

The libelants' witnesses testified that the night was clear with the moon shining about 20° above the horizon, the last quarter of the moon not having come; that few stars were visible and light cirrus clouds hovered in the sky.

The witnesses testifying for the Buenos Aires said that the moonlight was visible at times only; that nimbus clouds floated across the sky, covering the moon at times and interfering with visibility. They, however, admitted that the night was good for observing lights.

[3] It was the duty of the Buenos Aires when she discovered the Windrush ahead, without knowing definitely the course the latter was pursuing, to stop and reverse in the face of the manifest danger of the situation. In The Cushing (C. C. A.) 292 F. 560, 563, 565, this court held that the failure of the steamer to stop and reverse her engines in the face of danger was sufficient to fasten liability upon her. We there said:

"Failure to reverse until just before the collision is indicated by the log. Steam vessels must stop their engines in the presence of danger, or even anticipated danger, and the failure to do so has been the cause of condemnation of many vessels, where collisions have occurred. The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126."

And in The Diana (D. C.) 181 F. 263, affirmed 194 F. 1021, 114 C. C. A. 654, the court (at page 265) says:

"If the boats [steamer and bark] were in such position that there was not time to correctly ascertain what course the bark was holding, and to estimate whether the steamer could go to port or should proceed across the bark's bows, then the steamer should have stopped and reversed so as to lessen the danger of the position."

[4] The failure to see lights when properly set and burning, where due to want of vigilance, renders the vessel liable for a resulting collision. The John Rugge, 234 F. 861, 148 C. C. A. 459; The W. H. Gilbert, 232 F. 547, 146 C. C. A. 505; The David C.

Ritcey (D. C.) 223 F. 179; The Number 32, 170 F. 932, 96 C. C. A. 148.

It appears that for some time prior to the collision and at the time thereof the Windrush was proceeding with all her sails set except her royals, fore-top-gallant sail, flying gib and gaff topsails, all of which were furled. It also appears that the second mate, who was in charge of the watch, was aft; that a seaman was at the wheel; and that a competent lookout was stationed forward on the forecastlehead.

It is claimed on behalf of the Windrush that she was, prior to and at the time of the collision, displaying the regulation red and green side lights, which had been lighted at sundown on the evening before. But it was alleged by the Buenos Aires, in the answer which was interposed, that no lights were displayed by the Windrush or were visible to those on the Buenos Aires at any time.

[5] The statute required the bark to exhibit a proper red light on the port side and a green light on the starboard side visible for a distance of two miles. Comp. St. §§ 7836–7841. The court below has found as a fact that the lights of the Windrush were burning properly. We are convinced of the correctness of that finding. The sailor whose duty it was to care for the lights on the Windrush, and who was detailed as lamp trimmer, and who cleaned the lamps, testified that the binnacle lights and the lamps used about the deck were cleaned every day and the running lights every other day. On his cross-examination he testified as follows:

"Q. Of course, you took good care of them, didn't you? A. Certainly, I would hear about it if anything went wrong with them and the mate would find out about them.

"Q. Was the mate likely to find out about them? A. Yes.

"Q. How? A. Every half hour a bell was struck aft at the wheel; the wheelman struck the bell every half hour; the man on the forecastlehead, the lookout man—every time he struck the bell he had to report the lights, and he would sing out when the bell was struck, 'The lights are burning bright,' and the mate would answer, 'All right.'

"Q. Did the mate make any inspection to see if they were burning bright? A. No.

"Q. Then it wasn't certain that he would ascertain any default on your part in caring for the lamps? A. Why, yes; it is because if the lamps were out the lookout would let him know they were out."

The witness, whose testimony shows him to

have been truthful, testified on his direct examination as follows:

"Q. Can you tell me now when the lamps, particularly the running light of the Windrush, were trimmed by you previous to the collision? A. No, I am not absolutely sure whether it was that day or the day before; I couldn't say; I am not positive.

"Q. It was your custom, was it, to trim them every other day? A. Every other day.

"Q. And you can't recall now whether you cleaned them the day before the collision or the day before that? A. No.

"Q. What was the condition of those lights? A. They were in good condition."

This testimony was given nine months after the accident happened. But the steward on the Windrush testified positively that he saw the man cleaning the lights on the afternoon before the collision. He was asked: "You are sure you saw him that afternoon?" To which he answered, "Positive."

And the lookout on the Windrush testified that the lights on the bark were burning brightly just before the collision. He testified as follows:

"Q. Did you look at them (side lights) at 2 o'clock? A. Same as usual. * * * They were bright.

"Q. Now, when did you notice the side lights again after 2 o'clock? A. Well, I keep looking always about every five minutes, and then at half past 2 it strikes five bells. Then I reported to the second mate, * * * I sang out, 'Light burning bright, sir.'

"Q. You personally looked at your lights and saw that they were burning at 2:30? A. Yes. * * *

"Q. Were they burning brightly? A. Yes. * * *

"Q. When did you last see that side light lit before the collision? A. Just about a couple of seconds, about a minute."

The appellant contended first that the bark's lighthouses were improperly constructed. It was proved that they were properly constructed. It then contended that the burners were improper for use in the lighthouse because no chimneys were used. It was proved that the burners were proper. It then contended that the lights were smoky. It was proved that they were not smoky. It then contended that the method of cleaning and trimming was improper, and that the lamp trimmer did not use a suitable instrument. The court found against the Buenos Aires on all of these contentions and we concur in all those findings.

The testimony is convincing that the bark's side lights were lighted and burning brightly up to the moment of collision. When the lookout on the bark went on duty on the forecastle at 2 a. m., which was about three-quarters of an hour before the collision as those on the bark insisted, the lights were burning brightly. At 2:30 a. m. he reported to the second mate that the lights were burning. He testified as follows:

"Q. You personally looked at your lights and say that they were burning at 2:30? A. Yes.

"Q. Did the mate come up after that and look at them? A. He was once there and looked.

"Q. And you looked at both red and green lights? A. Yes.

"Q. And you saw that both were burning? A. Yes.

"Q. Were they burning brightly? A. Yes, when I see the steamer come closer, and didn't change her course, I was looking all the time. Always when a steamer passes at sea, she keeps away, miles away, but she was steering straight across our bow.

"Q. Then you went to look at the lights? A. Yes, when we walk on the forecastle from side to side you can see the lights all the time.

"Q. You are positive those lights were burning? A. Yes."

He was corroborated by other witnesses who were on the bark. A passenger on the steamer testified that about 2 a. m. or 2:15 a. m. he saw a sailing vessel exhibiting both red and green lights. If the collision occurred at 2:45 a. m. as those on the bark insist it did, this testimony is also corroborative of that given by those on the sailing vessel. And the District Judge who heard and saw the witnesses found as a fact that the lights on the sailing vessel were burning. There was, as is usual, a conflict in the testimony, and a number of the witnesses testified that they saw no lights after the collision. But the testimony that after the collision a witness saw no lights is not convincing that the lights were not burning at the time of collision, as the lights might readily be extinguished by the impact of collision, and especially is this true in a collision so severe that the stem of the steamer cut into a steel vessel a distance of 19 feet. See The Livingstone (D. C.) 87 F. 769, 776; Pennell v. United States (D. C.) 162 F. 64, 71.

We have not overlooked the testimony of the captain of the steamer who expressed the opinion that oil burning lights could not be jarred out by a collision. There was no testimony but his on that point, and as we are

satisfied that the lights were burning prior to the collision, we are not willing to decide this case on the opinion which he expressed.

The appellant's brief considers "the question of whether or not the bark was displaying her green side light as decisive of this entire case." This court concedes it to be decisive. But if it be·decisive and no green light was displayed by the bark, as required by law, those in command of the steamer certainly would have had the absence of the light at the time of collision strongly impressed upon their mind, and the absence of the light would have been noted in the log of the steamer. But no such entry in the log was made at the time. And this notwithstanding the statutes of the United States provide:

"In every case of collision in which it is practicable so to do, the master shall, immediately after the occurrence, cause a statement thereof, and of the circumstances under which the same occurred, to be entered in the official log book." Revised Statutes, § 4290 (Comp. St. § 8036).

It certainly is a matter of great significance that in a matter of such vital importance as the absence or failure to see the side lights of a sailing vessel, which was sent to the bottom by a collision with a steamer, the log of the steamer made no mention of the important and essential circumstance that the bark was displaying no lights at the time the collision occurred. It is hard to believe that so important an omission would have occurred had the lights not been burning. The Richmond (D. C.) 114 F. 208.

We again call attention to what this court said in The Fin MacCool, 147 F. 123, 77 C. C. A. 349, where we remarked as follows:

"The case is one for the application of the rule of evidence that positive evidence is ordinarily to prevail over strictly negative evidence, and that when one or more witnesses testify that they saw an object or heard a signal upon a given occasion, their testimony is to prevail over that of a same number of witnesses, of equal candor, who testify that they did not see or hear it. There is, in such cases, no necessary conflict of evidence as to the fact in question. The observation of the fact by some of the witnesses may be entirely consistent with the failure of the others to observe it, or their forgetfulness of its occurrence. Horn v. Balt. & Ohio R. Co., 54 F. 301, 4 C. C. A. 346, 351; Rhodes v. U. S., 79 F. 740, 21 L. Ed. 644, 25 C. C. A. 186; Stitt v. Huidekoper, 17 Wall. 393. Of course, in each case the opportunities of observation, and the interest prompting the witnesses to attentive·observation are to be considered; and the rule referred to is not inexorable, but is to be applied with due regard to the circumstances of the particular case. The whole subject is excellently treated in 17 Cyc. pp. 801–803, where all the authorities are collected.

"Upon consideration of all the evidence we are led to the conclusion that the men on board the Elder did not maintain a vigilant observation, and that the lights upon the wreck, though not seen by the lookout or any others of her crew, were visible, and ought to have been discovered."

And referring to the fact that the crew of the schooner testified that her lights were brightly burning, while the crew of the steamer testified that the schooner's lights were not showing properly, this court further said (114 F. 208):

"This positive testimony by those on the schooner, in a position to see the lights, and know of their condition, will not be lightly rejected because other persons, whose duty it was to have seen them, either failed to observe, or happened not to see them. Negative evidence of this character cannot be accepted to outweigh positive evidence. The failure to observe a light cannot be said to disprove its existence."

[6] In such cases the positive evidence of persons on the ship who were in a position to see, and who did see, the lights of the ship, is entitled to greater weight than that of mere negative witnesses who were on another vessel and who did not see the lights. The Alabama (D. C.) 114 F. 214; The Martha E. Wallace (D. C.) 148 F. 94; The Dorchester (D. C.) 163 F. 779; The Noreuga (D. C.) 211 F. 355, 358; The Creole (D. C.) 277 F. 119; aff'd (C. C. A.) 277 F. 122.

It was contended in the court below and in this court that the lights were defective in that the simplex burner used in the specially constructed steel lighthouses of the bark should have been fitted with "a globe or chimney." But an inspector of steam vessels who stated that he was familiar with the use of light towers on steam vessels, but admitted that he was not familiar with their use on sailing vessels, testified that simplex burners, similar to those used on the bark, were commonly used in the side lights of vessels, and that they were intended to be used without chimneys. And the captain of the bark, who had held a master's license for 30 years, testified that a simplex burner without a chimney was properly used in a lighthouse such as that on the bark. He was asked how far his red and green lights would show in

the conditions as they existed on the night of the collision at the time of the collision, and replied about 3 or 3½ miles. A seaman with 21 years' sea experience stated that such lights could be seen at least 3 miles. Another seaman with a like experience of 11 years gave a similar answer, and was corroborated by still another seaman. The court below found, and we see no reason for disturbing the finding, that the lighthouses for containing the side lights were properly constructed and the lights were of a kind carried by numerous sailing vessels.

The following is an excerpt from the testimony of the captain:

"Q. Which light did you have?  A. The simplex.  *   *   *

"Q. And any globes?  A. No.

"Q. Did you ever carry globes?  A. No, sir; because our lighthouse was with a wooden bottom that opened up with a trapdoor, and it was wind tight; no air could get in there, because we put that wooden bottom in to stop any air from going into the tower. *   *   *

"Q. It has been testified to by the witness here who preceded you on the stand that a lamp without a globe would go out in 3 hours.  A. Well, I never saw these go out in 10 hours.

"Q. How many years have you been carrying these lamps, side lights, with the lamps in them, on the Windrush, without globes?  A. Since 1912.

"Q. And the collision occurred in 1920? A. Yes.

"Q. Did the lights ever go out?  A. No.
*   *   *  "

The testimony that after the collision those on the Buenos Aires saw no lights on the Windrush, and that of the captain of the steamer that the jar of a collision does not extinguish oil lamps, loses any significance it might otherwise have had when it is remembered that the foremast of the Windrush fell over to the starboard immediately after the collision, and the light was just forward of the foremast so that it is highly probable that the sails and rigging of the mast completely obscured the light from the time it began to fall. And the master of the Buenos Aires was so alarmed that it would strike his vessel that he disengaged his steamer as quickly as possible. Those on the Buenos Aires must have been more concerned with the matter of their own safety in the few minutes which elapsed between the collision and the sinking than they were in the matter of lights. The sails, spars, and rigging on this mast as they fell to starboard might readily obscure the starboard light of the Windrush, even though the jar of the collision failed to extinguish it. And as the Windrush sank, as appears from the log of the Buenos Aires, within four minutes after the collision, the excitement which must have prevailed on the Buenos Aires at the time was not conducive, as counsel for the Windrush contended, to careful observation.

The value of the testimony of those on the Buenos Aires, who testified that prior to the collision they saw no lights on the Windrush, may be judged by the fact that they failed to see the Windrush itself. The testimony satisfies us that on such a night as that on which the collision occurred, with the moon in its third quarter and with practically no clouds, the Windrush, full rigged and with new canvas, irrespective of any lights would be easily visible at a considerable distance away; some of the witnesses testifying that she would be easily visible at a distance of at least two miles.

[7] It is contended that the bark was at fault for directing her course to port just before the collision. But this contention, if seriously put forward, is without merit. The bark was entitled to keep her course in reliance upon the duty of the steamship to keep out of the way. When it became apparent that the steamer did not intend to conform to the law if the bark, in an attempt to escape from the peril of collision, committed a fault of navigation, the fault was in extremis, imposed no liability, and makes no difference. The steamship which had plainly violated the law and caused the peril is alone to be held responsible. The Stifinder (C. C. A.) 275 F. 271, 276; The Lafayette (C. C. A.) 269 F. 917, 925; The Sea Gull, 23 Wall. 165, 23 L. Ed. 90.

[8] The general regulations for the prevention of collisions between vessels contain no provision relating to lookouts, except what is implied from the general rule that nothing shall exonerate the vessel, the owner, etc., from the consequence of any neglect to keep a proper lookout. But a vessel is bound to have a proper and reasonable lookout. And while no specific location is prescribed for the lookout, he is required by good navigation to be placed at the point best suited for the purposes of hearing and observing the approach of objects likely to come into collision with the vessel. The Nevada v. Quick, 106 U. S. 154, 1 S. Ct. 234, 27 L. Ed. 149. It has been held that as a rule he should be as near the water as possible to note the lights of crossing vessels and avoid them. The Prinz Oskar, 219 F.

483, 135 C. C. A. 195, affirmed 216 F. 233; Watts v. United States (D. C.) 123 F. 105. And the Circuit Court of Appeals in the Fifth Circuit, in The Pilot Boy, 115 F. 873, 875, 53 C. C. A. 329, 331, declared: "Elevated positions on a steamer, such as the hurricane deck, are not as favorable situations for the lookout as those on the forward deck near the stem."

The want of a competent lookout properly stationed and vigilant is a fault in a vessel as a result of which she assumes the consequential risk of a collision to which the fault contributed. The Anna W., 201 F. 58, 119 C. C. A. 396; The Greystoke Castle (D. C.) 199 F. 521; Graves v. Lake Michigan Car Ferry Transportation, 183 F. 378, 105 C. C. A. 598; The Volund, 183 F. 413, 105 C. C. A. 647.

The libels filed in these cases all alleged that the Buenos Aires failed to keep "a good lookout" and failed "to maintain a proper and vigilant lookout."

It is undisputed that the Buenos Aires at the time of this collision was navigating with no lookout on the forecastlehead. Instead, the man was stationed in the crow's nest on the foremast.

Article 29 of the International Rules (Comp. St. § 7868) provides that "nothing in these rules shall exonerate any vessel or the owner or master or crew thereof, from the consequences of any neglect * * * to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

It is true the statute fails to prescribe any specific place on a vessel for the lookout to be stationed, but the courts have held that good navigation makes it necessary that the lookout shall be stationed in the forward part of the vessel and at a point best suited for hearing and observing the approach of vessels and where his vision will be free from all obstructions.

The lookout on the Buenos Aires in the crow's nest was 75 feet above the water. This was a very great height and a very unusual one for a lookout to be placed. The captain of the Adriatic of the White Star Line, who has been in command of White Star ships for 21 years and had been in the employ of that company for 28 years, and was a disinterested and most competent witness, testified as follows:

"Q. You consider it necessary to maintain a man on lookout on the stem head? A. Yes.

"Q. State your reasons. A. I would rather have the man on the—if I had to only have one man on lookout, I would rather have him on the stem head than on the lookout, for the following reasons: That the officer—there is always two officers on the bridge. The officers on the bridge are higher and they can look after the horizon part, whereas the—the far distant part—whereas the stem head man can see better in the vicinity of the ship. * * *

"Q. Which man is in the better position to see a sailing vessel, a man stationed aloft in the crow's nest or a man stationed on the stem head? A. Daytime or nighttime?

"Q. Nighttime. A. The stem head man always in the nighttime.

"Q. Why do you say that? A. Because he has got a closer vision. His vision—the lookout man above is looking over the object. You will find that if you are more on the range with the object, a sailing ship's sails would loom up; if you were more level with it, you would see that blur quicker than the man that was looking over it, you see. * * *

"A. I am personally, if you ask my own personal opinion, I am in favor of the stem head man in preference (to one in the crow's nest)—as I said before, in preference to the lookout man, because he is too high. He can see things at a distance. Oh, very well, you see; he can pick up things at a distance; but if I had only one lookout man I would place him on the stem head.

"Q. Even on this ship? A. If I only had one man, I would rather he be—of course, we have regulations in the company, that they have—one man must be on the crow's nest and one man on the stem head. That is the regulation of the company. * * *

"Q. Assuming, Captain, that you had a dark night and there was a light of a sailing vessel which could be picked up, say, for two miles, which lookout man would be likely to pick that up first? A. The stem head man; he is more on a line with the vision.

"Q. Assuming, Captain, that the moon is behind you and the— A. Then that casts a shadow.

"Q. And a cumulus cloud is in the sky; which lookout would see a sailing vessel? A. Stem head man, I should think."

The following is a further excerpt from his testimony:

"Q. When you are in the crow's nest, where is your horizon, Captain? A. That all depends upon the height of the vessel. Now, our horizon would be about eight miles.

"Q. Suppose your crow's nest is 75 feet.

up; about where would it be? A. Ten miles. Seventy-five feet would be an enormous height.

"Mr. Sprague: You mean 75 feet from the deck?

"The Witness: I am speaking from the water. ❊ ❊ ❊

"Q. When you are speaking of the crow's nest on British ships, are those as high as 75 feet? A. No.

"Q. About how high? A. I should say about 40 feet; that is the average.

"Q. You would call 75 feet a very great height? A. Very high. ❊ ❊ ❊

"Q. A man stationed 75 feet— A. I am talking of an average ship.

"Q. You would consider that very high for a lookout? A. Yes.

"Q. And as I take it from what you say, for seeing close-by objects it is much better to keep your vision on a lower plane, if possible? A. Yes.

"Mr. Sprague: I object as leading.

"The Witness: Objects that are close.

"Q. And by close, do you mean objects within two miles? A. Yes."

And the captain of the Leviathan, who had an experience of 31 years and had crossed the Atlantic 754 times, testified as follows:

"Q. The question in which we are interested in this case is the proper place to station a lookout in the nighttime—have you given consideration to that question? A. I have never known anything else in my experience than carrying the lookout on the forecastlehead as long as we can, weather permitting, and also in the crow's nest. We never take the man out of the crow's nest; we always double up by putting a man on the forecastlehead.

"Q. What is the purpose of keeping a lookout on the forecastle head? A. We are under the belief, and always have been, that they can see better there. ❊ ❊ ❊

"Q. Can't you see better from a high elevation than a low elevation? A. On a perfectly clear day you can see at a greater distance; on a perfectly clear night, you would pick up a shore light 15, 20, or 30 miles away from that distance, but not a small vessel; you would never see a small vessel. ❊ ❊ ❊

"Q. Wouldn't you see the green and red lights sooner from the crow's nest than from the forecastlehead? A. I don't think you would pick them up, you would see that great distance; they are only supposed to be seen two or three miles. ❊ ❊ ❊

"Q. Wouldn't the side light of a sailing vessel, being 20 feet above the water, be seen

5 F.(2d)—28

quicker from an elevation of 70 feet than it would from an elevation of 20 feet? A. Not an oil side light; the man up above would be looking over the top of it, he would be right on top of it before he would pick it up, while the man on the forecastlehead would have it right in front of him.

"Q. You think that an oil side light carried 20 feet above water would be seen quicker by a man who is 20 feet above the water than by a man who is 70 feet above the water? A. I think so.

"Q. Why do you say that? A. Because I think that the man who is higher up would be looking right over the top of it."

Two witnesses called by the steamer testified that they favored the crow's nest for the lookout's position. The third witness similarly called stated that when the weather permitted, the best place was on the forecastlehead. The following is an excerpt from the testimony of the fourth witness:

"Q. Isn't the proper place for a lookout on the forecastlehead, in the eyes of the ship? A. It is, but if it is a cold night he walks about to keep his blood in circulation, whereas in the crow's nest he is protected from the weather to a greater extent."

The fifth witness for the steamer gave his reason for thinking the crow's nest to be the best place for a lookout. He said:

"Well, I think all objects, I have found from my experience they are more visible from the crow's nest than from any position on the ship, for the same reason that you can see better and sooner from the bridge than you can from the forecastle. ❊ ❊ ❊ "

The following is a further excerpt from his testimony:

"Q. Captain, just a moment ago Mr. Sprague asked you with reference to the Celtic, whether there was a lookout also on the forecastlehead, and you evaded the question by saying you had them all over; will you answer the question directly and say whether they had a lookout also on the forecastlehead? A. When the weather permitted."

He further testified:

"Q. Yes, but you did keep a lookout on the forecastlehead when the weather permitted? A. As an extra precaution. ❊ ❊ ❊

"Q. The other ones, you did keep a lookout on the forecastlehead? A. Yes. ❊ ❊ ❊ "

The witness was employed on the Cunard Line for six years serving as navigating officer from 1903 to 1909. He admitted that while so employed he kept a lookout on the

forecastlehead except in the case of three boats.

We are satisfied that a proper degree of care was not exercised by those in command of the Buenos Aires in stationing a lookout in the crow's nest 75 feet above the water without having a lookout placed forward on the deck in the bow where he could keep a better lookout for sailing vessels lying low on the water and having side lights only 20 feet above the water line.

[9] This brings us to a consideration of the libels filed by the administrators, who seek to recover for the loss of life of their respective decedents, two of whom were drowned after jumping into the water from the Windrush after the collision and another of whom died from exposure after having been picked up from the sea.

These libels were filed under the Act of March 30, 1920, entitled "Death on the High Seas by Wrongful Act." 41 Stat. 537 (Comp. St. Ann. Supp. 1923, §§ 1251½–1251½g).

The material sections of the act (Comp. St. Ann. Supp. 1923, §§ 1251½, 1251½c) are as follows:

"Section 1. *Right of Action; Where and By Whom Brought.* Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any state, or the District of Columbia, or the territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the District Courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued. * * *

"Sec. 4. *Rights of Action Given by Laws of Foreign Countries.* Whenever a right of action is granted by the law of any foreign state on account of death by wrongful act, neglect, or default occurring upon the high seas, such right may be maintained in an appropriate action in admiralty in the courts of the United States without abatement in respect to the amount for which recovery is authorized, any statute of the United States to the contrary notwithstanding."

The answers set up that the Buenos Aires was a Spanish ship and governed by the provisions of the Spanish law, which did not provide for the bringing of the suits in question. It was stipulated between the proctors on both sides that under the Spanish law there was a right of action in favor of the heirs or relatives of a decedent who suffered actual pecuniary damage by reason of the death of a person by negligent act against the person or persons responsible for such negligence, but that there was no right of action in rem against a vessel for damages for such death and no right of action in an administrator.

The trial court sustained the libels upon the ground that the liability for the deaths was to be determined by general maritime law, and that the Act of March 30, 1920, became part of the general maritime law and governed the situation.

Prior to the adoption of the Act of 1920, the Supreme Court held that the general maritime law did not provide a remedy for wrongful death. The Harrisburg, 119 U. S. 199, 7 S. Ct. 140, 30 L. Ed. 358; The Alaska, 130 U. S. 201, 9 S. Ct. 461, 32 L. Ed. 923; Butler v. Boston S. S. Co., 130 U. S. 527, 9 S. Ct. 612, 32 L. Ed. 1017; La Bourgogne, 210 U. S. 95, 138, 28 S. Ct. 664, 52 L. Ed. 973; Western Fuel Co. v. Garcia, 257 U. S. 233, 240, 42 S. Ct. 89, 66 L. Ed. 210.

But before considering the legal question involved we shall refer to the facts.

We doubt whether a case can be found in the reports which shows conduct more inhuman and shameful than that of those in command of the Buenos Aires immediately after the collision. It was the manifest duty of the captain in command of that vessel to render every possible assistance to the survivors of the vessel which his ship had sent to the bottom of the sea. This was his duty by every instinct of humanity as well as his duty under the express provisions of the law.

The Act of September 4, 1890, known as the Stand By Act, provides in section 1 as follows:

"That in every case of collision between two vessels it shall be the duty of the master or person in charge of each vessel, if and so far as he can do so without serious danger to his own vessel, crew, and passengers (if any), to stay by the other vessel until he has ascertained that she has no need of further assistance, and to render to the other vessel, her master, crew, and passengers (if any), such assistance as may be practicable and as may be necessary in order to save them from any danger caused by the collision, and also to give to the master or person in charge of the other vessel the name of his own vessel and her port of registry, or the port or place to which she belongs, and also the name of the ports and places from which and to which she is bound. If he fails so to do and no reasonable cause for such fail-

ure is shown, the collision shall, in the absence of proof to the contrary, be deemed to have been caused by his wrongful act, neglect, or default." St. vol. 26, p. 425 (Comp. St. § 7979).

The testimony in this case as to the course pursued by the master of the Buenos Aires after the collision would be incredible of belief if it were not substantiated by the testimony of witnesses who beyond a doubt are testifying truthfully. After the collision the Buenos Aires was at no time in serious danger, and although the evidence shows that the lifeboats could have been lowered, as there was no sea, but they were not in fact lowered until, according to some of the witnesses, four or five hours after the collision occurred, and according to others three or four hours after it happened. In the meanwhile sailors from the bark were exposed in the water, some 18 of them, and some died from the effects of their exposure. And although the collision happened about 3 a. m. it was not until at least three hours after daylight that any effort was made to lower a single boat. One of the passengers on the Buenos Aires testified as follows:

"Q. Were any efforts made before the lowering of these boats that you have just described? A. No, sir.

"Q. Made no efforts at all? A. No efforts to lower the boat.

"Q. Did you think it strange? A. Yes, I did.

"Q. Did you hear any protest being made on board ship? A. Yes, everybody was complaining.

"Q. What complaints did you hear? A. Why don't they lower a boat?

"Q. Whom did you hear saying that? A. The passengers.

"Q. Did you make any remarks like that yourself? A. Yes."

The steamer's log gives the time of collision as 3:15 a. m., and the appellant concedes that the survivors were not rescued until 6 a. m., nearly three hours after the collision. The master of the steamer admitted that "if you had sufficient men you could lower it (the lifeboat) in two minutes." As he had a crew of 138 men, he certainly had "sufficient men." The second officer of the ship testified to lowering a boat on another occasion in two or three minutes. And within 15 minutes after the collision the chief officer of the steamer had examined the damage which his vessel had suffered and found that "there was no danger of the Buenos Aires sinking," and so reported immediately to the master. There was no possible excuse for the inhuman course which was pursued. And it clearly appears to us that under the Act of 1890, above set forth, the master in charge of the Buenos Aires failed to render to those on board the Windrush "such assistance as may be practicable and as may be necessary in order to save them from any danger caused by collision." As he failed to do so for three hours and a number of the crew perished in consequence, "and no reasonable cause" for such failure was shown, we would be justified and required by the statute to hold that the collision was "caused by his wrongful act, neglect or default."

But in this case it happens that quite irrespective of the failure for three hours to render the assistance which humanity and the statute alike made it the duty of the Buenos Aires to render, the testimony makes it clear that responsibility for the collision rests solely upon the steamer and its owner, Compania Transatlantica de Barcelona.

It is urged upon us that the general maritime law being in effect the international law of the sea, upon which the leading maritime countries of the world are in agreement, it cannot be changed by the legislation of one country only, but must be accomplished by convention, treaty or joint legislation.

It is true that for some purposes a ship is, by a fiction of law, regarded as part of the territory of the nation whose flag she flies. This principle, however, is applicable to cases between the vessel and her passengers and crew in order that such persons may not be subject to no law at all. See Queen v. Keyn, 2 Ex. D. 63, 194. But the principle has no application in cases involving torts on the high seas as between ships of different nationalities having different laws. The Brantford City (D. C.) 29 F. 375; The Sagamore, 247 F. 743, 159 C. C. A. 601; The Scotia, 14 Wall. 170, 184, 185, 20 L. Ed. 822; The Belgenland, 114 U. S. 355, 5 S. Ct. 860, 29 L. Ed. 152; The Chattahooche, 173 U. S. 540, 550, 19 S. Ct. 491, 43 L. Ed. 801.

The nature and extent of the appellant's right must be determined according to the law of the place where the collision occurred and the obligation was incurred, and that place was on the high seas. Thomassen v. Whitwell, 9 Ben. 403, 408, Fed. Cas. No. 13,929.

But if the locus of the tort is the high seas, and the liability for the tort is to be determined by the law of the place where the tort is committed, then the recovery of the damages must be according to the rules of the

maritime law. Now the maritime law is only so far operative as law in any country, as was said in The Lottawanna, 21 Wall. 558, 571, 22 L. Ed. 654, as it is adopted by the laws and usages of that country. And since the Act of 1920 the maritime law which the courts of the United States enforce gives a right of action for negligent death on the high seas. And in Hughes on Admiralty (2d Ed.) pp. 224, 226, it is declared that a similar right is given by the laws of Holland, Belgium, France, Scotland, Italy, Germany, Austria, and Switzerland. It is stipulated that such a right exists under the law of Spain. The existence of this right thus recognized by the leading maritime nations of the world thus appears now to be so general that it may fairly be considered a part of the general maritime law which the maritime nations enforce.

It appears, however, that while under the laws of both the United States and Spain a cause of action exists to recover damages for death which results from a wrongful act, the law of the two countries differs as to the persons entitled to bring suit and as to whether there is a liability in rem against the offending vessel or in personam against her owner. Under Spanish law a suit in rem cannot be maintained against the vessel. But the law of the United States, the Act of 1920, gives a right of action "against the vessel, person, or corporation which would have been liable if death had not ensued."

The maritime law of the United States authorizes a proceeding in rem in a case of the nature of those now before the court, and in the courts of the United States the procedure will be in accordance with the law of the United States. "That law is supreme in our courts over the French law" in the matter of the procedure to be followed to enforce the libelants' rights. The Kongsli (D. C.) 252 F. 267.

In The Brantford City (D. C.) 29 F. 373, 382, 383, Judge Addison Brown said:

"But inasmuch as the high seas are the common ground of all nations, and are not governed by the merely municipal laws of either, the quality of acts committed on the high seas, as between persons or ships belonging to different nations, whose laws are different, is determined by the maritime law as accepted and administered in the forum where the suit is prosecuted. Hence acts, tortious by the law of England, if committed on the high seas, are actionable in England, though not tortious by the municipal law of the defendant's domicile, or of the ship's flag; and, in general, the law of the flag has no application to torts committed on the high seas, as between persons or ships of different countries having different laws. Foote, Priv. Int. Law, 398, 403; Mars. Coll. (2d Ed.) 208, 209, 212. The point was distinctly presented, and so adjudged, in the case of The Leon, 6 Prob. Div. 148. The same rule in this country has been repeatedly affirmed by the Supreme Court. The Scotland, 105 U. S. 24, 29; The Belgenland, 114 U. S. 355; s. c., 5 Sup. Ct. Rep. 860."

The Supreme Court in The Scotland, 105 U. S. 24, 29 (26 L. Ed. 1001), in 1881, speaking through Justice Bradley, stated the law as follows:

"In administering justice between parties it is essential to know by what law, or code, or system of laws, their mutual rights are to be determined. When they arise in a particular country or state, they are generally to be determined by the laws of that state. Those laws pervade all transactions which take place where they prevail, and give them their color and legal effect. Hence, if a collision should occur in British waters, at least between British ships, and the injured party should seek relief in our courts, we would administer justice according to the British law, so far as the rights and liabilities of the parties were concerned, provided it were shown what that law was. If not shown, we would apply our own law to the case. In the French or Dutch tribunals they would do the same. But, if a collision occurs on the high seas, where the law of no particular state has exclusive force, but all are equal, any forum called upon to settle the rights of the parties would prima facie determine them by its own law as presumptively expressing the rules of justice; but if the contesting vessels belonged to the same foreign nation, the court would assume that they were subject to the law of their nation carried under their common flag, and would determine the controversy accordingly. If they belonged to different nations, having different laws, since it would be unjust to apply the laws of either to the exclusion of the other, the law of the forum, that is, the maritime law as received and practiced therein, would properly furnish the rule of decision. In all other cases, each nation will also administer justice according to its own laws. And it will do this without respect of persons, to the stranger as well as to the citizen."

And again in The Belgenland, 114 U. S. 355, 369, 5 S. Ct. 860, 867 (29 L. Ed. 152) the court said:

"As to the law which should be applied in cases between parties, or ships, of different

nationalities, arising on the high seas, not within the jurisdiction of any nation, there can be no doubt that it must be the general maritime law, as understood and administered in the courts of the country in which the litigation is prosecuted."

And such is the doctrine of the English courts. In The Griefswald, 1 Swabey, 430, which arose out of a collision between a British ship and a Persian ship in the Dardanelles, Dr. Lushington said:

"In cases of collision, it has been the practice of this country, and, so far as I know, of the European states and of the United States of America, to allow a party alleging grievance by a collision to proceed in rem against the ship wherever found, and this practice, it is manifest, is most conducive to justice, because in very many cases a remedy in personam would be impracticable."

The decree is affirmed, with costs.